**COMBINED INSURANCE COMPANY OF AMERICA, Appellant (one of Defendants below),**

v.

**Carol SINCLAIR, Appellee (Plaintiff below).**

**No. 4819.**

Supreme Court of Wyoming.

Sept. 1, 1978.

William S. Bon and Robert H. McCrary, of Schwartz, Bon & McCrary, Casper, for appellant.

Joseph E. Vlastos, of Cardine, Vlastos & Reeves, Casper, and R. C. Yonkee, Thermopolis, for appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

GUTHRIE, Chief Justice, and McCLINTOCK and RAPER, Justices, concur in the majority opinion authored by ROSE, Justice.

McCLINTOCK, Justice, filed a concurring opinion, in which GUTHRIE, Chief Justice, joins.

THOMAS, Justice, filed a dissenting opinion.

ROSE, Justice.

### NATURE OF THE ACTION

This appeal comes from a civil action commenced by Carol Sinclair, in which she asked damages for personal injuries sustained in a two-motor-vehicles accident which occurred at approximately 12 midnight on Sunday, July 28, 1974. Miss Sinclair filed the suit against Combined Insurance Company, Kent Scott Beardall, and Katherine C. Rush, Administratrix of the Estate of Edward Danner Boone, Deceased. Edward Boone was the driver of the automobile in which Carol Sinclair was a passenger, and Mr. Beardall was the driver of the oncoming car which was involved in the accident. Carol sought to recover against defendants Beardall and Boone for their alleged wrongdoing, while asking damages against the Insurance Company upon the theory that Mr. Boone was its employee as a vice principal or superior servant and was, at the time of the accident, within the scope of his employment. She, therefore, contended that the negligence of Mr. Boone was imputable to the appellant Insurance Company employer. We are only concerned here with Carol Sinclair's action against Combined Insurance, against which defendant the jury assessed damages in the sum of $350,000.00. We will affirm the district court's judgment entered upon this verdict.

### FACTS

I. *The Accident:*

Carol Sinclair was severely injured in a collision between two automobiles which occurred on U.S. Highway 89, approximately five miles north of Afton, Wyoming. At the time, she was a passenger in a 1973 Datsun driven by Edward Boone, who was traveling in a southerly direction toward Afton. The Datsun collided head on with another car driven by Kent Scott Beardall, who was traveling in a northerly direction. As a result of the collision, Edward Boone was killed and Miss Sinclair, Mr. Beardall, and the passenger in the latter's vehicle were injured. Mr. Beardall has no recollection of the accident, and Carol Sinclair and the passenger in the Beardall vehicle were both asleep at the time of the collision. Therefore, the evidence concerning the accident itself is necessarily confined to the physical facts, together with the testimony of the investigating officer, Highway Patrolman Boyd Roberts.

The physical facts attendant upon this impact, as evidenced by the photographs and the testimony of Patrolman Roberts, together with the sketch or plat which he prepared to illustrate his testimony, establish that the collision occurred on a curve in the northbound lane of traffic, which the Beardall vehicle was lawfully occupying. The curve was structured in a way which compelled a southbound automobile traveling in the direction of the Boone Datsun to turn to the driver's right. It appeared that Boone straightened out the curve and the vehicles came together in a head-on fashion on the wrong side of the road for Boone, with the major impact being to the right-side-front, or passenger-front of each automobile.

In the course of his investigation, Patrolman Roberts requested the assistant coroner to take a sample of blood from the body of Boone and deliver it to the Wyoming Public Health Services Laboratory. It is contended that this was done, although Roberts did not witness the taking of the sample and the coroner did not testify. The report of the test performed disclosed a blood-alcohol level of .22% ethyl alcohol and this report was received in evidence. According to Wyoming criminal statutes, this blood-alcohol content raises the presumption that the driver was under the influence of alcohol, a fact concerning which the jury was instructed by the court. The record is unclear as to whether Miss Sinclair's attorney or defendant Beardall's attorney requested this instruction, but this is unimportant for purposes of considering the questions relevant thereto.

II. *Combined Insurance Company of America:*

Combined Insurance Company is principally engaged in selling health and accident insurance throughout the United States. It has no local offices, since its insurance is sold mostly through personal public contact. This involves two principal sales features, namely, the renewal of existing policies and the sale of new policies. Of critical importance to our consideration is the renewal of existing six-month health and accident policies.

In order to carry out this personal-contact sales schedule, representatives of Combined Insurance Company are formed into "teams," with a Sales Manager as the supervisor of each team. The success of the program renders critical the maintaining of a full team complement, as well as the employment of effective sales techniques. The Company provides a computerized printout list of existing policyholders to each Sales Manager, and each person listed on the printout must be contacted by the team members. The various employees are paid on a commission basis, with the Sales Manager receiving cash and incentive bonuses, together with a percentage of the income from the policies renewed or those sold for the first time by the members of his team.

When hired, the employee is required to attend a two-weeks school at the expense of the Company in the course of which the members of the class participate in intensified training sessions where they are introduced to the benefits of the various sales techniques developed by the Company over a span of fifty-two years. When this instruction is completed, the trainees are tested and directed to utilize these newly acquired sales methods as they go about selling the appellant's insurance. Immediately following the completion of the training school program, the new employees take their respective State insurance examinations under the sponsorship of Combined Insurance Company. Upon obtaining his or her license, and being assigned to a particular team, the new salesperson then embarks upon a one-month "in the field" training schedule under the tutelage of the Sales Manager.

III. *Edward Danner Boone—Sales Manager:*

At the time of his death, Edward Boone was a Sales Manager for Combined Insurance Company with a ten-county area in Western Wyoming as his territory. In addition to being Sales Manager for this area with authorization to act in appellant's behalf subject to its rules and regulations, his Superior's instructions, and the terms of his contract, Mr. Boone's position was also designated as "Sales Manager of the Superior Policy Department."

One of his major responsibilities was the day-to-day supervision of the sales team and the assignment of the computerized printout cards having to do with policy renewals. With respect to Mr. Boone's supervision of his team members, a schedule was furnished him by the Company with direction that it be followed relative to the various communities to which the team would travel and the period of time it would work within each community. These sales trips were calculated to coincide with the expiration of the six-month policy period concerning existing health and accident insurance policies and it was, therefore, essential to the Company's success that the team efforts be carefully coordinated with these expiration dates. While Mr. Boone did not hire the members of the team—a responsibility of the District Manager—it was Mr. Boone's duty as Sales Manager to supervise his team, arrange for accommodations and plan the advance work for the next community in which the team would be selling.

The team members would meet on Sunday evening in the community where the selling was scheduled to take place during the upcoming week, and Mr. Boone would make the renewal contract assignments at that time. Each evening, after the day's contacts had been made, the members would meet with Mr. Boone for the purpose of advising with him about any problems

they had encountered or which they or he anticipated. Boone would, in turn, meet weekly with the District Manager to go over the past week's sales and to review the next week's schedule. Mr. Boone, as well as each member of the team, was required by Combined to have his or her own motor vehicle for use in carrying out the appellant's sales-program.

## IV. *Carol Sinclair:*

On July 28, 1974, Carol Sinclair was a 19-year-old woman employed as a salesperson by Combined Insurance Company and engaged in the renewal and sale of health and accident insurance. Miss Sinclair and her friend, Janet Harutyk, were hired at about the same time in 1974. They attended training school together and were graded the highest in their class, after which they took and passed the Wyoming insurance examination and joined Mr. Boone's sales team. Carol had difficulty selling insurance, and Janet decided to leave the Company, which she did on July 27, 1974. Miss Sinclair had lost a sale that day and, with her friend leaving, she, too, was seriously considering quitting her job with Combined Insurance. She confronted Mr. Boone with this possibility and he urged her to stay, representing that he would immediately commence her field training and assuring her that, with his help, her sales would increase.

Mr. Boone then advised Miss Sinclair that he had to go to Jackson that day and asked her to accompany him, promising that he would, during the trip, work with her on the presentation speeches and rebuttal arguments which she was to employ in her sales relationship with prospective customers. Boone also promised Carol that if she would remain with the Company he would accompany her the next day to a customer's place of business, where he believed the opportunity for selling a new or renewal policy was good. The evidence is clear that, since Mr. Boone was responsible for keeping up the team strength, he was most anxious not to lose the services of Miss Sinclair and was doing all he could to placate her so she would remain on his sales team. During the trip to Jackson, Mr. Boone worked with Carol on her sales presentations and rebuttals as he had promised he would. She testified that Mr. Boone drank two cans of beer as they traveled between Afton and Jackson, Wyoming. She also testified that she knew that the team's next stop was Jackson, and, when they left Afton, she assumed that Mr. Boone was going there to make accommodations and do his advance work in behalf of the team.

The two went to the Cowboy Bar in Jackson, where Carol drank two tequila drinks and one gin collins. Boone, in her presence, consumed three drinks. While at the bar, Boone asked Carol to visit with a woman they met there to advise with her about the benefits of the Company opportunities, all with an eye to the possibility that this individual might be suitable for employment. Carol complied with this request.

During the early evening, Carol complained of experiencing stomach cramps, whereupon she returned to the Boone vehicle and fell asleep. She did not regain consciousness until after the accident.

## V. *Injuries to Carol Sinclair:*

The injuries to Miss Sinclair were so extensive that they need only be mentioned here in a summary manner. Both of her knees were fractured and her left hip was shattered, necessitating five separate surgical procedures. These operations required bone grafting—leg lengthening—the rebuilding of the knees, and a resultant fusion of the left knee. It was not until October, 1976, that she learned to walk again without some type of walking aid. Lengthy therapy was required, and additional future surgery is in prospect. The doctors' and hospital bills came to $28,424.52—her pain and suffering were great—her disfigurement extensive and, therefore, her past present and future damages were and are massive.

## VERDICT AND JUDGMENT

The jury awarded Miss Sinclair $350,-000.00 for her injuries arising out of Mr.

Boone's negligence, which was found to be the proximate cause of the accident. The jury further found Mr. Boone was, at the time of the accident, acting within the scope of his employment with Combined Insurance as its employee in the role of vice principal or superior servant and was not an independent contractor. The court entered judgment on this verdict.

### ISSUES FOR DECISION

We are asked to decide the following issues:

(1) Whether Mr. Boone, at the time of the accident, was acting within the scope of his employment;

(2) Whether or not Mr. Boone was an independent contractor or an employee or vice principal whose acts are imputable to Combined Insurance;

(3) Whether the court committed prejudicial error in admitting the Boone blood-alcohol test;

(4) Whether there was prejudicial evidence in the court's instruction on the effect of intoxication;

(5) Whether alleged misconduct of counsel deprived the appellant a fair trial in the area of the damages award;

(6) Whether there was evidence of Boone's negligence; and

(7) Whether the jury's award was excessive in that

(a) It indicates passion and prejudice;

(b) It was aided by improper argument of counsel;

(c) It was aided by the erroneous instructions of the court; and

(d) It was not supported by sufficient competent evidence.

(1) *Scope of employment.*

██ There is sufficient evidence of record to support a conclusion that Mr. Boone went to and returned from Jackson at least partially in behalf of his employer's business interests. Whether or not he was within the scope of his employment at the time of the accident became a fact question for the jury. *Barnes v. Fernandez,* Wyo., 526 P.2d 983, 985. The question is one of law only when the conduct in question is shown clearly to be within or without the scope of employment. *Sun Land & Cattle Co. v. Brown,* Wyo., 394 P.2d 387, 390. And see, *Husted v. French Creek Ranch, Inc.,* 79 Wyo. 307, 333 P.2d 948. The issue was not so clear-cut here as to warrant its disposal as a matter of law.

The evidence shows that much of Mr. Boone's time and attention expended during the trip to Jackson, and while in Jackson, was addressed to persuading Carol Sinclair to remain as an employee of Combined Insurance and to help her with the problems she was having with her sales' efforts. The welfare and training of the team members were a part of the duties of Mr. Boone as he represented his Company's interests.

██ The rule is that one will be held to be within the scope of his employment when the employee is engaged in an activity which has a multiple purpose, and it is sufficient that one of the purposes is employment-related. The rule from Prosser on Torts, 4th Ed., p. 461 is

" . . . that in general the servant's conduct is within the scope of his employment if it is of the kind which he is employed to perform, occurs substantially within the authorized limit of time and space, and is actuated, *at least in part,* by a purpose to serve the master." [Emphasis supplied]

Addressing the kind of conduct within scope of authority, Restatement of Agency, 2nd Ed., § 229, says:

"(1) To be within the scope of employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized."

Again, where the conduct is actuated by a dual purpose—partly in behalf of the master and partly to serve the interest of the employee—the employee will be within the scope of his employment. Restatement of Agency, 2nd Ed., § 236. We have held that an act may be within the scope of employment although done in part to serve the purpose of the workman (employee). *Standard Oil Co. v. Smith,* 56 Wyo. 537, 111 P.2d

**1042**

132, 135, citing *White v. Mercer County Poor Directors,* 114 Pa.Super. 348, 351, 174 A. 834, 836; and *Wineland v. Taylor,* 59 Idaho 401, 83 P.2d 988. The fact that *Standard Oil v. Smith* was a workmen's compensation case does not alter the rule of scope of ·employment with which we are concerned here.

▪ When Boone's activities are measured against these tests, we think the evidence is sufficient to support a jury decision finding Mr. Boone to have been within the scope of his employment. Further, when the authorities above cited are taken into account, we find no error in the manner in which the court instructed the jury on the issue of scope of employment.[1] If anything, the instruction was somewhat more favorable to the appellant than the above-discussed rules would indicate was necessary.

*(2) Independent contractor or employee.*

The jury, given the facts and proper instructions, found Mr. Boone to be a vice principal or superior servant employee of Combined Insurance Company acting, at the time of the accident, within the scope of his employment, and, therefore, his negligence was imputed to his employer. The appellant's theory that Boone was an independent contractor was rejected.

▪ In Wyoming, as a matter of public policy and economic requirement, a master is liable for damages caused by the negligence of his servant while acting within the scope of the servant's employment. *Blessing v. Pittman,* 70 Wyo. 416, 251 P.2d 243, 246. The overriding consideration in determining whether one is an employee or an independent contractor lies in ascertaining whether or not the employer has the *right*

*to control* the details of the work whereby liability is sought to be established. *Stockwell v. Morris,* 46 Wyo. 1, 22 P.2d 189. This issue is ordinarily a question of fact for the jury and becomes a question of law only when but one reasonable inference can be drawn. *Barnes v. Fernandez, supra;* and *Tyler v. Jensen,* 75 Wyo. 249, 295 P.2d 742, 749. More particularly, the extent to which an employee has the "right to control" is primarily a jury question. *Holly Sugar Corporation v. Perez,* Wyo., 508 P.2d 595, 598.

In deciding whether, as of the time of the accident, there is sufficient evidence of record to take the question of the employer-employee relationship between Boone and Combined Insurance to the jury and support a verdict holding the relationship to exist, we must look to the evidence most advantageous to the appellee and give it every favorable inference.[2] The base determining factor is whether Combined retained *the right of control* of the manner that Boone operated his vehicle and not whether such control was in fact exercised. *Stockwell v. Morris, supra; Brubaker v. Glenrock Lodge Intern. Order of Odd Fellows,* Wyo., 526 P.2d 52 (1974); *Tyler v. Jensen (1956), supra; Fox Park Timber Co. v. Baker,* 53 Wyo. 467, 84 P.2d 736, 120 A.L.R. 1020 (1938); *Chatelain v. Thackery,* 98 Utah 525, 100 P.2d 191, and *Ludlow v. Industrial Commission,* 65 Utah 168, 235 P. 884. See, also, 41 Am.Jur.2d, Independent Contractors, §§ 5 and 7.

In addition to the right of control, another test (or perhaps an indicia of the right-of-control test) is said to be whether the right to terminate the employment is retained and can be exercised without incur-

---

1. The instruction given by the court was:
 "YOU ARE INSTRUCTED that an act within the course and scope of employment or authority is an act of a servant or employee which occurs while the servant or employee is engaged in the duties which he was employed to perform and such act is, or reasonably appears to be, necessary and proper to accomplish those duties. It is not necessary that a particular act or failure to act be expressly authorized by the employer to bring it within the scope of employment or authori-

 ty, and it may be impliedly authorized, but such act must bear some genuine relationship to the business of the employer. The servant is not acting in the scope or course of his employment or authority if he is engaged in some pursuit or activity of his own at the time."

2. *Rissler & McMurry Co. v. Atlantic Richfield Co.,* Wyo., 559 P.2d 25; and *Kahler v. Martin,* Wyo., 570 P.2d 720.

ring liability. In *Fox Park Timber Company v. Baker, supra,* and repeated in *Brubaker v. Glenrock Lodge, supra,* we said:

> " . . . Another test is whether either of the parties possesses the right to terminate the services at will without incurring liability to the other, this embracing, of course, the right of the employer at any time to discharge the party performing the work, an affirmative answer establishing the status of master and servant. . . . "

The same question arises in the corollary situation where the inquiry concerns which principal a servant is acting for when one or the other is to be held responsible for the servant's negligence. The tests reviewed above are, in such instances, applicable, with *Tyler v. Jensen, supra,* adding the " 'in whose business was the servant engaged' " test.

 If, at the time of the accident, the employee is engaged in furthering the employer's business interests, and with respect thereto the employer has the right to control the details of the work and to discharge the employee for failing to follow orders without incurring liability, there can be no independent contractor relationship. We have defined an independent contractor when we said:

> " ' . . . An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer except as to the result of the work.' . . . " *Lichty v. Model Homes,* 66 Wyo. 347, 211 P.2d 958, 967.

Evidence of appellant's retention of the right to control the activities of Edward Boone may be summarized as follows:

1. He had to have a vehicle in order to further the business of Combined.

2. This was also true of the team members over whom he exercised supervision.

3. Boone was hired by, and under the contract was capable of being fired by, Combined.

4. The amount of Boone's commissions and bonuses were fixed by Combined.

5. Boone took his instructions as to the manner he would cover his territory and the way the team members would cover it from a superior employee of Combined—the District Manager.

6. The price of the product being sold was fixed by Combined.

7. It was a necessary part of Boone's job to be on the road and to keep the team members on the road in behalf of Combined.

8. Boone was performing work for the Company when he took Miss Sinclair to Jackson and back while working with her on her presentation, and it is not contended that he did not have a right to be doing this.

9. Boone was known as the "Sales Manager of the Superior Policy Department" of Combined Insurance.

10. He was described as a Combined Insurance Company supervisor.

11. Under his contract, Boone's *entire efforts* were to be *exclusively* devoted to his job as sales representative.

12. Boone was eligible to participate in the Combined Insurance Company's pension by reason of his association with his Company.

13. While Boone's job was that of promoting business through personal contact between his team members and the public, he did not hire and fire the team members, but this was done by a Combined Insurance District Manager. He accepted such team members as his District Manager assigned to him.

14. Combined furnished Boone the computerized list of policyholders from which most of his income originated.

15. Boone was required to report to and meet with a Combined Insurance Company District Manager each week, whereupon the last week's business, as well as the upcoming week's business, was discussed.

16. Boone was bound by the terms of his contract with Combined Insurance, which provided in relevant part:

"(1) The Company hereby appoints the Sales Manager as Sales Manager of the Superior Policy Department to act for the Company, *subject to the rules and regulations of the Company* and the terms and conditions hereinafter set forth, exclusively for the sale of the policies and renewals indicated in this Paragraph (1) only in and for the following territory (hereinafter called the 'Sales Territory'), viz: . . . ." [Emphasis supplied]

And it further provides:

"(3) The Sales Manager agrees to observe and practice, and cause those operating under his supervision to observe and practice, sound underwriting principles, *and to abide by the rules, regulations and instructions issued by the Company from time to time*; further, the Sales Manager agrees to devote his entire time and best efforts in developing the sale of the above identified policies and renewals in the Sales Territory, and agrees that he will not replace, nor will he permit salesmen under his supervision to replace, policies already issued with new policies but will write and cause salesmen under his supervision to write renewals of policies in force, whether issued before or during the period the Sales Manager serves as such hereunder, except where the premium of the new policy is different from the premium of the policy being replaced and such replacement is authorized under the standard underwriting practices of the Company. The Sales Manager agrees that while this Agreement is in force, he will not, at any time, without written approval of the Company executed by its President or Executive Vice-President, directly or indirectly represent any other insurance organization or company or place any insurance except with the Company, or aid or abet anyone else in representing any other insurance organization or company or placing any insurance except with the Company." [Emphasis supplied]

We think that the control and retention of the right-to-control factors set out above, together with the evidentiary showing that—at least in part—the business of the Company was being furthered by the trip to Jackson—all taken together—establish the employer-employee relationship between Combined and Boone at the time of the accident. At the very least, there was sufficient evidence to support the verdict. It is also clear that Combined retained and exercised the right of, as well as actual, control over the details of Boone's work.

We should say—perhaps in emphasis— that the most telling evidence indicating the intention of the parties with respect to the type of association they contemplated is the contract of employment itself, which, as we have noted, provides that the conduct of Mr. Boone, while he was acting within the scope of his employment, was to be governed by the rules and regulations of the Company. The facts taken as a whole support the conclusion that this *right of control* extended to the manner in which Mr. Boone operated his vehicle.

### *Stockwell v. Morris* Revisited

In *Stockwell v. Morris,* 46 Wyo. 1, 22 P.2d 189 (1933), we accepted the "right of control" as being the appropriate test for determining whether one was an employee or independent contractor (we talked about "agent" in that case) and said:

" . . . If, accordingly, *the right of control* is the test in connection with the question before us, and the courts apparently agree that it is, then, it would seem, it ought to be directed to that portion of the employment directly connected with the factor by reason of which liability is sought to be established. It would not do, we think, to pursue the shadow, leaving the substance out of consideration." [Emphasis supplied]

In explaining the application of this test to the particular facts presented in *Stockwell,* we said:

"In this view, then, that the right of control of the physical movements—the automobile—is the decisive inquiry, it becomes important what the record discloses in that regard. The evidence shows that the Maytag Company furnished Mor-

ris no rules or regulations to govern him in the performance of the work but that the means and manner thereof was left to him. That, perhaps, does not definitely show that the right of control was not in the company. The fact that the company did not exercise control does not show that it did not have the right of control, though it may be some evidence thereof. It has been held that in the absence of a stipulation the existence or nonexistence of the right must be determined by reasonable inferences shown by the evidence. *Press Pub. Co. v. Acc. Comm.,* 190 Cal. 114, 210 P. 820; *May v. Farrell,* 94 Cal.App. 703, 271 P. 789." As we have said previously, these matters are largely fact questions for the jury. *Holly Sugar Corporation v. Perez, supra.*

In the instant case, as compared to *Stockwell, supra,* there was more than adequate evidence of the "right to control" the details of Boone's work, including the manner in which he operated his vehicle, when the contract of employment is contemplated in connection with all of the other facts and circumstances surrounding the relationship. We need no such stipulation as is mentioned in the rule from *Stockwell, supra,* to establish that the right to control the physical movements of Boone's vehicle was retained by the Company. The contract provided that he was a Sales Manager—he was in charge of a team of salespersons and the only means of carrying on the Company's business was by use of automobiles upon the highways of the territory. With respect to *all* of his duties, Boone was obligated to abide by the

"rules, regulations and instructions issued by the Company from time to time."

There is no contract provision which serves to make him subject to the Company's rules and regulations *except* when he is driving himself and his team members upon the highways of Wyoming while in pursuit of the business of the Combined Insurance Company. Boone was under Combined's control, not only as to the results which he obtained in his sales and supervisory efforts, but, at least impliedly, he was also

under appellant's control as to the means whereby he obtained them. *Chatelain v. Thackeray,* 98 Utah 525, 100 P.2d 191. These contractual provisions, taken together with the other facts showing Boone to have held responsibility of a supervisory nature, distinguish the facts of this case from *Stockwell.*

For us to say that the operational facts and the contract provisions aforesaid did not leave the company with a *right to control* the way Boone operated his vehicle while in the scope of his employment for Combined Insurance—and especially when he had other employees in the vehicle— would be contrary to logic and human experience.

(3) *Whether the court committed prejudicial error in admitting the Boone blood-alcohol tests.*

Combined contends that the trial court committed prejudicial error in admitting the report of Boone's blood-alcohol level over its objection thereto. It is suggested that error occurred in two respects: first, that the report did not fall within the hearsay exception established by the provisions of the Uniform Official Reports as Evidence Act, [§§ 1–165 through 1–169, W.S. 1957] (in effect when this action was tried, but since superseded); and second, that there was an insufficient showing of the underlying foundation for the report.

 The relevant parts of the Official Reports as Evidence Act are:

"§ 1–166. Official reports and findings of fact as evidence.—*Written reports or finding of fact made by officers of this state, on a matter within the scope of their duty as defined by statute,* shall, in so far as relevant, be admitted as evidence of the matters stated therein. [Emphasis supplied]

"§ 1–167. Copy to adverse party.— Such report or finding shall be admissible only if the party offering it has delivered a copy of it or so much thereof as may relate to the controversy, to the adverse party a reasonable time before trial, unless in the opinion of the trial court the

adverse party has not been unfairly surprised by the failure to deliver such copy.

"§ 1–168. Right of adverse party to cross-examine.—Any adverse party may cross-examine any person making such report or findings or any person furnishing information used therein; but the fact 'that such testimony may not be obtainable shall not affect the admissibility of the report or finding, unless, in the opinion of the court, the adverse party is unfairly prejudiced thereby."

The special need for this exception to the hearsay rule is found in the inconvenience of requiring public officials to appear and testify concerning reports—with special trustworthiness being assigned to their reports by virtue of the declarant's official duty and the probability that the duty has been accurately performed. McCormick on Evidence, 2nd Ed., § 315, at 735–736. As we view this hearsay exception, the reliability of such evidence is lessened when the report does not fall within the official's statutory duty or a duty required by the nature of his office. See, "Admissibility, under public records exception to hearsay rule, of record kept by public official without express statutory direction or authorization," 80 A.L.R.3d 414.

 In the instant case, the blood-alcohol report, which was admitted into evidence, was issued by Gene G. Rugotzke, Chief of the chemical testing program, Division of Health and Medical Services, after submission of a blood sample by the Lincoln County Coroner and Patrolman Roberts. There is no serious question that Mr. Rugotzke is a state officer, but the record discloses that counsel for Carol Sinclair failed to make any showing that the blood-alcohol report was made pursuant to a duty imposed by law or required by the nature of Mr. Rugotzke's office.[3] Such a showing is usually a prerequisite to admission of written reports under the Act. See, *State v. Snider*, 168 Mont. 220, 541 P.2d 1204, and *Law v. Kemp*, 276 Or. 581, 556 P.2d 109, 113. See also, *Croker v. State*, Wyo., 477 P.2d 122, 128, where a report by the Department of Agriculture was admitted under the Act.[4] Without the benefit of such information, the trial court erred in admitting the blood-alcohol report.

Even more serious, however, is Combined's contention that there was, in any event, an insufficient showing of foundation as to the circumstances surrounding the taking of Boone's blood sample. The testimony of Patrolman Roberts reveals that, based on his detection of the odor of alcohol in the Boone vehicle, he requested the county coroner to draw the sample of blood. The sample was taken on July 29, 1974, the morning after the accident, by the assistant coroner, but the patrolman could not recall whether he was present, and the assistant coroner was not called to testify. The evidence indicates that Patrolman Roberts sent the sample to the Public Health Laboratory, which received it on August 5, 1974, and subsequently returned a report to Patrolman Roberts. We find this foundational evidence to be totally inadequate.

 Even if a written report, pertaining to blood-alcohol levels, is within a statutory or other hearsay exception, its admissibility is dependent upon a showing that the same was

---

3. Our research discloses that the statutes have granted the Department of Health and Social Services, pursuant to § 35–1–240(a)(ix), W.S. 1977 [§ 35–25(9), W.S.1957], the power:

"To establish, maintain and approve chemical, bacteriological and biological laboratories and to conduct or require such laboratory investigations and examinations as it may deem necessary or proper *for the protection of the public health*;" [Emphasis supplied]

We fail to see how the performance of blood-alcohol tests falls within this statutory authorization. Furthermore, we find that the parties' reference to § 35–230, W.S.1957, 1975 Cum.

Supp.—dealing with the state chemist who works for the department of agriculture—has no relevance to this case, since the officer performing the test in question was not in the department of agriculture.

4. It is noted that in *Croker*, we were concerned with the analysis of a controlled substance. Pursuant to § 35–347.6, W.S.1957, 1975 Cum. Supp., all officers of the state have the duty to cooperate in this area, thus providing the department of agriculture with a recognizable duty for the purposes of the Official Records Act.

". . . taken by a duly-authorized person using proper sterile equipment, that it was properly labeled and preserved, that its care and transportation were proper, and also the identity of persons processing it so as to give the opposing party the opportunity to cross-examine as to the care and procedure used in the test. . . ." *Lessenhop v. Norton*, 261 Iowa 44, 153 N.W.2d 107, 111. See *Robinson v. Life & Casualty Ins. Co. of Tennessee*, 255 N.C. 669, 122 S.E.2d 801; McCormick on Evidence, supra, § 209 at 513; and 29 Am.Jur.2d, Evidence, § 830. Compare, *Booth v. State*, Wyo., 517 P.2d 1034, 1037. Such a foundation was not supplied in the instant case, and the trial court, therefore, erred in admitting the blood-alcohol report. Appellee's contention that she should not be held accountable for this error, since defendant Beardall offered the report in evidence, is without merit. See *McDonald v. Kansas City Gas Co.*, 332 Mo. 356, 59 S.W.2d 37, 39, which indicates that one defendant may in certain cases so prejudice the rights of another defendant by introducing incompetent evidence, that a reversal of a judgment in favor of the plaintiff may be required. The important question, then, in this case, is whether the admission of the blood-alcohol report prejudiced the rights of Combined.

(4) *Instruction as to the presumption of intoxication:*

█ The trial court, over Combined's objection, instructed the jury that, pursuant to § ·31–5–233(b), W.S.1977 [§ 31–129(b), W.S.1957, 1975 Cum.Supp.]:

"If there was at that time [while driving a vehicle] 0.10% or more by weight of alcohol in the person's blood, it shall be presumed that the person was under the influence of intoxicating liquor, to a degree which renders him incapable of safely driving a motor vehicle."

The court instructed that it was unlawful for a person to drive while under the influence of intoxicating liquor to a degree rendering him incapable of driving safely, quoting § 31–129(a), W.S.1957, 1975 Cum. Supp. Instruction 19 further provided:

"Violation of a Statute is evidence of negligence. If you determine that a party violated a Statute on the occasion in question, then you may consider that fact, together with all the other facts and circumstances in evidence, in determining whether or not the party was negligent at the time of the occurrence."

Combined urged below, and now on appeal, that the statutory presumption of intoxication was not applicable to a civil action for damages. A clear majority of the courts who have considered this question have agreed with Combined's position, holding that such an instruction is an improper comment on the evidence. See, "Construction and application of statutes creating presumption or other inference of intoxication." 16 A.L.R.3d 748, 757–758 (and cases cited therein). Contra, *Interstate Life & Accident Insurance Co. v. Whitlock*, 112 Ga. App. 212, 144 S.E.2d 532. A reading of our statute, § 31–129(b), supra, discloses that the presumptions contained therein are applicable only "upon the trial of any *criminal* action or proceeding." We hold the trial court committed error in giving this instruction, leaving only a question as to whether Combined was prejudiced thereby.

### No Prejudicial Error

Notwithstanding our holding that there is error in the introduction of Rugotzke's report on Mr. Boone's blood-alcohol content, and in giving an instruction on the statute defining the conditions whereby a presumption of intoxication will be established, we are still confronted with the question of whether or not the errors were prejudicial.

The jury found the defendant's employee to be grossly negligent. *The only evidence of gross negligence was the evidence of Boone's intoxication*, as established by the inadmissible chemist's report, from which the jury could conclude that Boone caused the accident by reason of his presence on the wrong side of the road while under the influence of alcohol.

█ In order for the plaintiff to recover in this case, it was not necessary for her to

prove gross negligence because she was not a guest in the Boone automobile. She was a fellow employee of Boone's at a time when they were both acting within the scope of their employment for Combined Insurance Company. Further, Miss Sinclair was not precluded from bringing suit against their common employer because Boone was a vice principal and, therefore, this relationship is excepted from the fellow-servant doctrine which prevents one employee from suing the employer under the doctrine of respondeat superior where a fellow servant has caused injury. Prosser, Law of Torts (4th Ed. 1971), § 80, at 528–530. Therefore, Miss Sinclair could have recovered from Combined if she had alleged and proved ordinary negligence. The jury, however, found Mr. Boone guilty of gross negligence and, in answer to interrogatories, failed to make any finding as to his ordinary negligence.

■ Gross negligence includes ordinary negligence. See, *McClure v. Latta*, Wyo., 348 P.2d 1057; and *Severin v. Hayes*, Wyo., 372 P.2d 1017. This would, of course, not be helpful in this case if the only ordinary negligence of record was identical with the evidence of gross negligence. This would be so because, if there was no evidence of ordinary negligence in addition and unrelated to the prohibited evidence of gross negligence, the prejudice of the tainted evidence and instruction would be clear.

The record in this case, however, discloses separate and uncontradicted evidence of Boone's ordinary negligence which would have entitled the plaintiff to a directed verdict as to liability, assuming certain jury determinations on other matters—scope of employment, independent contractor, and guest status determinations. Under such circumstances, we are unable to conclude that the errors herein affected the jury's verdict as to liability. Compare, *State Highway Commission v. Triangle Development Co.*, Wyo., 369 P.2d 864, 869.

In this regard, we note that § 31–5–209(a)(i), W.S.1977 [§ 31–107, W.S.1957], the Wyoming statute with respect to driving within one's own lane of traffic, provides:

"(a) Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply:

"(i) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety;"

The statute was given to the jury, as it properly should have been. See, *Hester v. Coliseum Motor Co.*, 41 Wyo. 345, 285 P. 781, and *Wallis v. Nauman*, 61 Wyo. 231, 157 P.2d 285, 289.

There is no question, in this case, that the accident took place on the wrong side of the road. Highway Patrolman Roberts testified that the gouge marks—impressed at impact—from the Beardall vehicle were located in Beardall's lane. The initial gouges were straight and then they swerved toward the center line—with the left wheels of the Beardall vehicle positioned on the center line *after* the occurrence. All of the debris was in Beardall's lane. The impact took place on the passenger side of each car. The cars ended up in Beardall's lane. There was no explanation given with respect to these circumstances, nor was there any contradicting evidence. It is true that—for certain purposes and under certain circumstances—the deceased driver, Boone, would be presumed to be exercising due care for his own safety. Authorities are collected on this proposition in Justice Guthrie's [now Chief Justice] dissenting opinion in *Brown v. Riner*, Wyo., 500 P.2d 524, 528, as follows: *Gish v. Colson*, Wyo., 475 P.2d 717, 720; *Culver v. Sekulich*, Wyo., 344 P.2d 146, 154; *Wilhelm v. Cukr*, 68 Wyo. 1, 227 P.2d 988, 991, reh. den., 230 P.2d 507, 508; and in addition see 29 Am. Jr.2d, Evidence § 211, p. 262. The presumption, however, is not applicable when the evidence is sufficient to dispel or rebut the presumption. See, *Gish v. Colson, supra.* Given the evidence in this case, the presumption provides no assistance to the defendant Boone.

We are, then, confronted with evidence of ordinary negligence which is of such a nature as to satisfy the requirements of a directed verdict as to liability. The appropriate rule is set forth in *Barnes v. Fernandez*, Wyo., 526 P.2d 983, 985, as follows:

> ". . . 'whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.'
> . . ."

In the present case, there was only one conclusion that the jury could have possibly reached—negligence on the part of Boone. This was true, regardless of the blood-alcohol evidence and instruction. We hold, therefore, that, since the plaintiff would have been entitled to a directed verdict on the liability issue, the errors committed herein could not, as a matter of law, have affected the jury's verdict.

The last question on this issue of prejudice is whether or not we can glean passion and prejudice from the jury's reaction to the alcohol evidence.

For purposes of our analysis here, we have to assume that there is no legal connection between liability and damages. Compensatory damages are given to compensate an injured party for loss. *Walton v. Atlantic Richfield Company*, Wyo., 501 P.2d 802. Exemplary damages, on the other hand, are not calculated to compensate the plaintiff's loss, but to punish for a wrong that has been done. *Crawford v. Pittsburgh-Des Moines Steel Co.*, D.Wyo., 386 F.Supp. 290. Except where willful and wanton misconduct is alleged and exemplary damages are claimed, damages are not assessed as a penalty. Exemplary damages were not asked in this case. This is true where gross negligence is at issue just as it is with ordinary negligence. Given the same injury, it would not be proper for a jury to award a high damage figure where the defendant is charged with gross negligence for causing injury while drinking and driving on the wrong side of the road, but a lower damage figure where the alleged liability consists of a sober person causing injury while driving upon the wrong side of the road in violation of a statute. The injury to the plaintiff is the same in each circumstance and the jury may not penalize in either case—it may only compensate for damages.

We are left, then, with the question as to whether there was sufficient evidence to support the damage verdict.

Our search of the record leads us to the conclusion that there was sufficient evidence of injury and resulting expenses to support the award of $350,000.00.

The admission of the blood-alcohol report and the instruction related thereto was, for the reasons set out above, error—but the error was not, under the facts of this case, prejudicial.

(5) *It is urged that certain irregularities in the proceedings and misconduct of counsel in presenting his final argument prevented appellant Combined Insurance Company from receiving a fair trial:*

(i) Precisely, it is appellant's position that the court erred in allowing counsel, in argument, to advise the jury concerning the effect of its finding.

The court permitted the appellee's counsel to argue vicarious liability—which was the theory of her case, and further permitted appellant to argue its theory as well. The court, also, by proper instruction, informed the jury of the legal theories of both parties. That this procedure was proper needs no citation of authority whatever. The court admonished counsel that they would not be permitted to advise the jury in arguments or at any other time relative to the consequences of its verdict with respect to the percentage of negligence or how the award would be determined on the judgment to be entered. This was consistent with our comparative-negligence ruling in *Woodward v. Haney*, Wyo., 564 P.2d 844 (1977). There was no violation

of the court's injunction as disclosed by the record.

(ii) Appellant argues that prejudicial error was committed as a result of counsel for the plaintiff making improper remarks in his final argument concerning unit of time basis for pain and suffering—in personally vouching for plaintiff's truthfulness and in comparing values of race horses, ball players and paintings.

Some of the conduct of counsel concerning which appellant objects is the so-called "unit of time" argument. This technique contemplates the assuming of an arbitrary figure for pain and suffering for a unit of time and then multiplying it by the minutes, hours, days, or years during which counsel assumes the plaintiff will suffer. This procedure has been and is condemned by this court for the reason that it assumes evidence of pain and suffering's precise monetary value which is not in the record. In *Henman v. Klinger*, Wyo., 409 P.2d 631, we adopted the "Botta Rule" which rejects the unit-of-time argument.

In the instant case, plaintiff's counsel argued:

". . . And I submit to you to consider that there was a physician here, Doctor Walker, that was paid one hundred seventy-six dollars to stop pain during the operation, a hundred and seventy-six dollars to have freedom from pain during the surgeries. Now that is what he charged. And you have to make that decision. This pain, what is it worth; a dollar a day, a dollar a week?"

Objection was made and counsel was admonished not to proceed with this line of argument. He pursued it no further.

At another juncture, counsel said:

"That is what I mean by mental pain and suffering. What is that worth? You have to decide that on your own knowledge and your own consideration of human experience. You have to do that. Is that fifty-three thousand dollars for fifty-three years? That is for you to decide. : . . ."

No objection was made to this last remark and we will not consider the urging by appellant that this was error, since the record was not protected through objection. We have said that timely objection to argument of counsel must be made, failing which the court on appeal will not rule upon the objection. *Logan v. Pacific Intermountain Express Co.*, Wyo., 400 P.2d 488.

With respect to the first statement aforesaid, we must observe that, while these remarks of counsel come seriously close to infringing upon the "unit of time" argument, they fall somewhat short. We said in *Henman v. Klinger, supra,* that the typical "unit of time" argument was such as we were there considering. Counsel in that case argued:

" 'The fact is, this man was hurt and hurt horribly and he was in excruciating pain and most of the time it was indescribable pain, and he was in the hospital for seventy days, and I wouldn't ask you to say, but, well, what would you take in money for seventy days in the hospital in this kind of pain? You take your seventy days in the hospital, I don't know what you would take for it, but I am going to say in this case the evidence is of such a nature that you could award $200.00 a day for that seventy days, * * * ' "

In addition, attorneys confronted with allegedly improper and prejudicial conduct by opposing counsel must make objections and call upon the trial judge to correct erroneous impressions as they are made. *State Highway Commission v. Peters*, Wyo., 416 P.2d 390. While objection was made to the above-mentioned remark of counsel first referred to, opposing counsel did not ask that the trial judge instruct the jury to disregard the statement or otherwise correct the record. In *State Highway Commission v. Peters, supra,* we said:

"We have repeatedly said it is incumbent upon counsel to object to the conduct of opposing counsel and give the trial court an opportunity to instruct the jury to disregard the same or otherwise correct the record, before alleged prejudi-

cial error arising therefrom can be considered on appeal. *Webber v. Farmer,* Wyo., 410 P.2d 807, 809; *Edwards v. Harris,* Wyo., 397 P.2d 87, 95." 416 P.2d at 396.

The verdict here was $350,000.00 and, in view of the proven damages, the figure is not excessive and, consequently, there is no indication that counsel's remarks influenced the jury in a manner such as would indicate passion and prejudice on its part.

Where the same issue was before us in *Henman v. Klinger,* Wyo., 409 P.2d 631, 635, we said:

"Thus, against such a background we cannot say that the award made for permanent partial disability, loss of earning capacity, and for pain and suffering, as a direct result of the technique utilized by plaintiff's counsel, was shown to have been excessive or that the award was 'so excessive or unreasonable as to indicate passion or prejudice on the part of the jury.' *Pan American Petroleum Corporation v. Like,* Wyo., 381 P.2d 70, 76. Particularly is that true where, as here, the trial court, on a motion for new trial based upon that ground, refused to set aside the verdict."

There was no other conduct of counsel which we find to be objectionable.

The remaining issues, which are concerned with the sufficiency of evidence of negligence and the amount of the jury's verdict, have been fully discussed in the body of this opinion. The evidence of negligence was sufficient to support a directed verdict on liability; and the damages, in view of the proven injury and attendant costs, were not excessive.

Affirmed.

McCLINTOCK, J., concurring, with whom GUTHRIE, Chief Justice, joins.

I concur with the majority opinion and offer these further remarks:

I agree that both the evidence as to possible intoxication and the instruction concerning the same were erroneous. Ordinarily, I think that such a conclusion would necessarily result in a reversal and requirement for new trial. However, I also agree with the court's further conclusion that the errors were not prejudicial upon the facts of this case and that there is no necessity of a new trial. As I view the case, and considering the evidence as to intoxication completely incompetent, there still remained in the case unrefuted evidence that the defendant Boone was on the wrong side of the road, without explanation or justification therefor, and this fact as a matter of law required a verdict for the plaintiff on the question of negligence.

Before amplifying my reasons for agreeing with what I consider is for this jurisdiction a new application of an old principle of law, I should like to say, with reference to my Brother Thomas's dissent, that I do not believe Beardall's location near or at the center of the road, or his possible responsibility to contribute to any damages paid by the other defendants, was an issue before this court. I find nothing in the briefs claiming error in that respect and I feel that it is well settled law in this state that this court should not and will not consider points that are not raised in the brief. *Roberts Construction Co. v. Vondriska,* Wyo., 547 P.2d 1171, 1178 (1976); *Booth v. Hackney,* Wyo., 516 P.2d 180, 185 (1973).

As to the possible dispute concerning where the accident occurred, I can add nothing to what has been said by Justice Rose and agree that there is no legitimate question of fact but that it occurred in the east lane of traffic as Boone was proceeding south. The defense has come up with no explanation or justification whatsoever for his presence on this side of the road so we have a situation where under applicable law a prima facie case of negligence has been made and remains unrefuted unless we engage in speculation or conjecture as to how he got on the wrong side. Where a prima facie case of negligence has been made, unrefuted in any way, I am convinced that the direction of a verdict for the plaintiff on the question of negligence is proper. I quote from *Newing v. Cheatham,* 15 Cal.3d 351, 124 Cal.Rptr. 193, 198, 540

P.2d 33, 38 (1975), in turn quoting from the earlier case of *Walters v. Bank of America Nat. Trust & Savings Ass'n*, 9 Cal.2d 46, 69 P.2d 839, 840 (1937):

" * * * 'The trial court, in a proper case, may direct a verdict in favor of a party upon whom rests the burden of proof, in this case the plaintiff. Substantially the same rules apply to directed verdicts in favor of plaintiffs as apply to such verdicts in favor of defendants. [Citations] A directed verdict may be granted, when, disregarding conflicting evidence, and indulging every legitimate inference which may be drawn from the evidence in favor of the party against whom the verdict is directed, it can be said that there is no evidence of sufficient substantiality to support a verdict in favor of such party, if such a verdict has been rendered. * * *' "

In *Nelson v. Brames*, 253 F.2d 381, 383 (10 Cir. 1958), a wrong-side-of-the-road case, where defendant had given an explanation found by the district and appellate courts to have been sufficient to raise a factual question with the jury, the court said:

"Whether judged by the Wyoming or Federal rule, a peremptory instruction directing a verdict is proper only when but one inference or conclusion can be drawn from the evidence. * * * When fair minded persons may form different conclusions and inferences from facts, the question of negligence is for the jury."

By holding in this case that plaintiff was entitled to a verdict on the question of negligence, I do not think that we establish any absolute liability, or commit ourselves to a theory of negligence per se that imposes absolute liability upon one who violates a rule of the road, whether decisional or statutory. I do not think that that is the law of Wyoming. Such presence on the wrong side of the road may result without fault on the part of the driver in technical violation. *Wallis v. Nauman*, 61 Wyo. 231, 243, 157 P.2d 285, 288 (1944), cites but does not seem to rely upon the then applicable meeting statute, § 72–204, W.S.1931. The court concluded that there was sufficient evidence of negligence and affirmed the decision of the trial judge, sitting without a jury, to that effect. However, the court cites various authorities to the effect that absolute liability does not exist merely because one is on the wrong side of the road, and I find nothing in the opinion that indicates that being upon the wrong side of the road is to be considered as negligence per se. This statement from *Nelson v. Brames*, 241 F.2d 256, 257 (10 Cir. 1957) I think succinctly summarizes the Wyoming law:

" * * * [T]here is no actionable negligence where without fault on the part of the driver an automobile skids across the center line of the highway to the left side thereof and collides with another motor vehicle, but that the burden rests upon such driver to show that he was there without any act of commission or omission which constituted fault on his part. *Wallis v. Nauman*, 61 Wyo. 231, 157 P.2d 285."

I have found few cases holding that a directed verdict was properly directed in favor of plaintiffs on the question of negligence. Nor do I find many indicating on appeal that direction of such a verdict would have been proper. However, the principle seems clear to me that if the plaintiff makes a prima facie case, thereby thrusting the burden of going forward with the evidence upon the defendant, two courses logically follow: First, if the defendant makes a showing factually strong enough to rebut the case made by the plaintiff, the question is for the jury; secondly, if no case at all is presented by the defendant, then the judgment must be in favor of the plaintiff because as a matter of law the defendant has failed to meet his burden.

In *Sughero v. Jewel Tea Co., Inc.*, 37 Ill.2d 240, 226 N.E.2d 28 (1967) reh. denied, the driver of the offending truck testified he had been following three other vehicles proceeding in the same direction but he was the only one to have trouble at an intersection when the leading car made a sudden turn to the left, and his truck invaded the left side of the road. The trial court found

his explanation insufficient and directed a verdict that he was negligent which was affirmed by the appellate court, 66 Ill. App.2d 353, 214 N.E.2d 512 (1966). The sole question before the supreme court was said to be "whether the trial court properly directed a verdict in favor of the plaintiff on the question of liability." In affirming, the court said, 226 N.E.2d at 29:

> "* * * As the appellate court noted, however, the fact that the two automobiles in front of him and the truck behind him were under sufficient control to stop safely within their lane of traffic indicates that he did not have his vehicle under proper control. We think the appellate court's conclusion was correct on this issue."

Here an explanation was given which the court found unacceptable as a matter of law. If an attempted justification can be ruled improper as a matter of law, then in my opinion it necessarily follows that failure to give any explanation whatsoever properly results in a verdict against the party having the burden. The Supreme Court of Missouri does not seem to have agreed with this view. In *Friederich v. Chamberlain*, Mo., 458 S.W.2d 360, 366, after setting forth certain rules pertaining to wrong-side-of-the-road accidents, and the inferences that are to be drawn therefrom, the court conceded that an inference of negligence was created by the offending party's presence on the wrong side of the road. This inference of negligence operated to establish a prima facie case and shifted to the offending driver the burden to "excuse the presence of his vehicle on the wrong side of the road." But strangely, it seems to me, the court continued that if "no evidence of justification is presented, the question of negligence is for the jury." I find this conclusion that no evidence is more probative than a possible explanation unacceptable.

The Kentucky court, in *Norton v. Hughes*, Ky., 408 S.W.2d 197 (1966), reh. denied, refers to earlier decisions of that court and appears to me to hold that location upon the wrong side of the road permits an inference of negligence " 'unless other circumstances (and fair inferences to be drawn from them) so clearly support or overcome the inference of negligence that reasonable minds could not differ about the ultimate conclusion.' " In *Stark's Adm'x v. Herndon's Adm'r*, 292 Ky. 469, 166 S.W.2d 828, 830 (1942), reh. denied, a wrong-side case, the appellate court, faced with a situation in which there was no explanation by the offending driver and the cause had been submitted to the jury, concluded that "the nature of the evidence and its prima facie character were sufficient to submit the issue to the jury." The court was not there faced with the question whether a directed verdict was required since the jury had found in favor of the person on her own side of the road. However, in the earlier case of *Thronton v. Phillips*, 262 Ky. 346, 90 S.W.2d 347 (1936), the same court had recognized the necessity of an explanation by the driver of the offending car, and pointed out that this driver had denied all knowledge of the presence of the other car on the highway and his collision therewith (in other words, essentially the same situation where one does not testify at all). The court said, 90 S.W.2d at 349:

> "* * * The evidence establishing that Thronton's truck was to the left of the center of the highway in which it was traveling at the time it collided with the Phillips car is uncontradicted. It is in like manner established that the driving it to the left of the center of the highway was the proximate cause of the accident. * * * In these circumstances Mrs. Phillips was, in reality, entitled to a peremptory instruction as to the negligence of the driver of the Thronton truck."

I find nothing in later cases abrogating this principle and think that it is most pertinent to the case at bar.

I accept the *Sughero* and *Thronton* cases as reaching the logical and proper result and therefore conclude that in this case, absent an explanation of Boone's presence on the wrong side of the road, it must be found as a matter of law that he was guilty of negligence. This negligence was sufficient as a matter of law to require a verdict in favor of the plaintiff.

THOMAS, Justice, dissenting.

I am compelled to dissent from the majority opinion in this case. I can see no conclusion but that the case must be returned to the district court for a jury to properly try factual issues relating to the liability of the defendants Beardall and Boone (and Combined Insurance Company as Boone's employer or master). I cannot agree that the erroneous admission of evidence of Boone's intoxication and the erroneous giving of an instruction concerning the presumption of intoxication were not prejudicial.

The majority opinion treats the situation as if the only issue of negligence, and its resulting liability, existed between the plaintiff, Carol Sinclair, and Boone and Combined Insurance Company. This approach ignores the right of contribution available in the State of Wyoming since 1973, and now found in § 1–1–110, W.S. 1977. Since the adoption of that statute, in negligence cases in which there is more than one defendant, a defendant has additional opportunities with respect to liability. As always he can attempt to defeat the claim of the plaintiff, but if he is found to be liable he has an opportunity to spread the damages to any other tort-feasor. In this instance Carol Sinclair pleaded the negligence of the two drivers, Beardall and Boone. The respective defendants cross-claimed against one another for their right of contribution, and those issues remained present in the case up through its submission to the jury and the return of the special verdict.

It is unfortunate that counsel have not been afforded an opportunity to present this aspect of the case, but since the result of the jury verdict was such that Beardall was completely excused and Boone, being found guilty of gross negligence, probably enjoyed no right of contribution pursuant to § 1–1–110(c), W.S.1977, there really was no reason for the parties to pursue the matter. The necessity for consideration arises only because of the substitution by this court of a verdict of ordinary negligence for a verdict of gross negligence.

I am not certain that the authorities cited in the majority opinion necessarily say that ordinary negligence is included in gross negligence. I am certain, however, that if a verdict of gross negligence must be set aside because of the erroneous admission of evidence, there is nothing left in which to include a finding of ordinary negligence by the jury. I read the majority opinion as recognizing that but justifying the affirmance of the judgment by a conclusion that Boone was guilty of ordinary negligence as a matter of law, and a directed verdict of liability against him in favor of Carol Sinclair would have been inappropriate. For me this does represent an injudicious invasion of the province of the jury.

The majority approach ignores the right of Boone to contribution if Beardall also were negligent in accordance with § 1–1–110, W.S.1977. The majority opinion looks only to the evidence of Boone's negligence in justifying this result, and the proper rule for viewing the evidence in such a case is not recognized. I quote from *Barnes v. Fernandez,* Wyo., 526 P.2d 983, 985 (1974), a case cited in the majority opinion, as follows:

"In determining the question of whether a verdict should have been directed, under Rule 50(a), W.R.C.P., we must consider the evidence favorable to the party against whom the motion is directed, giving to it all reasonable inferences. *Brennan v. Laramie Newspapers, Inc.,* Wyo., 493 P.2d 1044, 1048; *Svalina v. Big Horn National Life Insurance Co.,* Wyo., 466 P.2d 1018, 1020; *Holstedt v. Neighbors,* Wyo., 377 P.2d 181; Wright & Miller, Federal Practice and Procedure: Civil § 2524, Vol. 19, p. 544."

With respect to the portion of the evidence that is to be considered in performing this function, the rule set forth in 9 Wright & Miller, Federal Practice and Procedure, § 2529, p. 573 (1971), appears to me to be sound:

"The correct rule seems to be that the court may consider all of the evidence favorable to the position of the party opposing the motion as well as any unfa-

vorable evidence that the jury is required to believe. Thus it may take into account evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses. But statements that all of the evidence is to be considered are too broad. Unfavorable evidence that contradicts the favorable evidence must be disregarded as must evidence that is admitted for a limited purpose, such as 'impeachment." [footnotes omitted]

It must be recognized that if the judgment is to be affirmed in this instance by a holding that Carol Sinclair was entitled to a directed verdict on the issue of negligence as against Boone and his employer it also follows that result also encompasses a directed verdict against Boone and his employer and in favor of Beardall on the issue of Beardall's negligence. The majority opinion analyzes only the evidence of Boone's negligence. There is a good deal of evidence favorable to the position of Boone and his employer which under the proper view of the evidence must be taken into account. Beardall had arisen about eight or nine o'clock the preceding morning, and had been up 15 to 16 hours at the time of this accident. He had engaged in water skiing during the day, and had traveled in the automobile something more than 300 miles since seven or eight o'clock in the evening. He and his companion had stopped in Evanston for dinner, and Beardall had been driving from Evanston on. Beardall has no recollection of the accident. This is also true of the plaintiff and Beardall's passenger, both of whom were asleep at the time of the accident. Beardall's vehicle made no brake or skid marks prior to the collision. The left gouge mark as discernable on a blown-up photograph appears to almost contact the center line of the highway, and it was made by a part of the vehicle that would be more than 12 inches inside the left fender of the Beardall vehicle. The Beardall vehicle was across the center line when it came to rest. The rotational forces of the collision would have pulled the left front side of the Beardall vehicle closer to the center line than it had been at the time of impact. The parts of the Beardall vehicle which made the gouge marks could have been as much as five feet behind the front of the vehicle.

The majority points to the conclusions of the highway patrolman relative to the place of the gouge marks, but the clearest evidence is found in the photograph. The jury was instructed as follows:

"The rules of evidence ordinarily do not permit the opinion of a witness to be received as evidence. An exception to this rule exists in the case of an EXPERT WITNESS, who by education, study and experience has become expert on a particular subject and may be permitted to testify as to his opinion on any matter in which he is so versed. The ultimate weight which is to be given to the testimony of expert witnesses is a question to be determined by the jury, and there is no rule of law which requires you to surrender your own judgment to that of any person testifying as an expert witness, or to give controlling effect to the opinions of such witnesses; in other words, the testimony of an expert, like that of any other witness, is to be received by you and given such weight as you think it is properly entitled to; but *you are not exclusively bound or concluded by the testimony of any witness, expert or otherwise."* [Emphasis added.]

If the testimony of the highway patrolman is to be regarded as unfavorable to Boone, the conclusory aspects are the most significant unfavorable evidence, and according to the instruction, which I submit is accurate, the jury was not required to believe that testimony.

All this leaves me with a sure conviction that there was evidence from which a jury reasonably could conclude that Beardall also was negligent. If we are concerned with a statute prohibiting driving in the other lane, the same rule would apply to both Beardall and Boone. Under these circumstances I see no choice but to submit the matter to the jury, the proper body under our law in Wyoming to decide issues

of fact relating to the evidence and the inferences to be drawn therefrom. There is no other way to avoid the prejudicial effect of the evidence of intoxication and the corollary instruction as it pertains to liability between Boone and his employer and Beardall. A jury in weighing the relative negligence of Boone and Beardall must have been influenced by the evidence and the instruction relative to intoxication, and the verdict as returned satisfactorily establishes that the jury was so influenced. That prejudice is not abated by the majority result.

For these reasons I am persuaded the case must be reversed and remanded for a new trial.