2005 WY 130

**DIAMOND B SERVICES, INC.,**
Appellant (Petitioner),

v.

**Lawrence ROHDE, Appellee**
**(Respondent).**

**Lawrence Rohde, Appellant (Defendant),**

v.

**Diamond B Services, Inc.,**
**Appellee (Plaintiff).**

**Nos. 04–258, 04–259.**

Supreme Court of Wyoming.

Oct. 6, 2005.

Rehearing Denied Nov. 1, 2005.

pending against Caton at the same time.

Representing Diamond B Services, Inc.: Terry W. Connolly of Patton & Davison, Cheyenne, Wyoming.

Representing Lawrence Rohde: Steven W. Holland of Huenergardt & Vance, Kimball, Nebraska.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

KITE, Justice.

[¶ 1]  In these cross appeals, the parties contest the Department of Employment's (Department) order which granted Lawrence Rohde's request for unpaid wages from Diamond B Services, Inc. (Diamond B Services), but denied his request for interest on the unpaid wages, attorney fees, and costs. The district court affirmed the administrative decision.

[¶ 2]  We hold the Department had jurisdiction to hear Mr. Rohde's wage claim and there is substantial evidence to support the Department's decision that Mr. Rohde is entitled to be paid his wages. That aspect of the Department's decision is, therefore, affirmed. We conclude, however, the Department is authorized by statute to award interest on the unpaid wages, attorney fees and costs. The Department's decision, holding that it did not have the authority to make those awards is reversed, and we remand for a determination of Mr. Rohde's claims.

## ISSUES

[¶ 3]  In Case No. 04–258, Diamond B Services presents the following issues for our review:

A. Whether the Department's finding that the Claimant was an employee of Diamond B Services was arbitrary and capricious and unsupported by substantial evidence.

B.  Whether the Department improperly created contractual provisions not in accordance with law.

C.  Whether the Department misapplied the Wage Offset Rules[.]

D.  Whether the Department of Employment Wage Offset Rules, or its interpretation thereof, [are] in derogation of Wyoming Statute.

E.  Whether the Department of Employment lacked subject matter jurisdiction to hear this particular wage claim.

Mr. Rohde restates the issues as:

1.  Does the Wyoming Department of Employment lose subject matter jurisdiction to take claims for unpaid wages if the employer illegally withholds more than two month[ ]s of wages which were earned by an employee?

2.  Is the Wyoming Department of Employment's decision which stated that Lawrence Rohde's claim for unpaid wages is enforceable to the extent of $6,400.00, supported by substantial evidence?

In Case No. 04–259, Mr. Rohde states the following issue:

Is an employee who has quit or has been discharged from service, who has cause to bring suit for wages earned and due, and establishes with the Wyoming Department of Employment the amount which is justly due, entitled to recover interest on the past due wages at the rate of eighteen [percent] (18%) per annum from the date of discharge or termination, together with reasonable attorney fees and all costs of the suit, pursuant to the provisions of W.S. § 27–4–502 (2003) and W.S. § 27–4–104(b) (2003)?

Diamond B Services restates the issue as:

A.  Did the hearing officer err in refusing to award Mr. Rohde attorney[ ] fees, costs and interest[?]

**FACTS**

[¶ 4]  In 1997 or 1998, Randy Burry contacted Mr. Rohde, who was employed as an automobile mechanic in Grand Island, Nebraska, and asked him to move to Pine Bluffs and work for Diamond B Casing, Inc. (Diamond B Casing).  At that time, Diamond B Casing, which was in the business of constructing pipelines and fences, was owned by Randy Burry's brother, Robert Burry.[1]  Mr. Rohde accepted the offer of employment and moved to Pine Bluffs.  On October 27, 1998, Randy Burry's wife, Devota, wrote a check for $3,330.07 from a "Diamond B" account to Home Federal Savings & Loan to pay off Mr. Rohde's truck loan.  On December 31, 1999, Mr. Rohde and Randy Burry joined Robert Burry as shareholders in Diamond B Casing.  Mr. Rohde contributed his personal tools as consideration for his interest in the company.

[¶ 5]  Diamond B Services was incorporated in June 2000, by Randy and Devota Burry.  Diamond B Services' home office was located in Pine Bluffs, and it was in the business of providing large trucks to transport automobiles across the country.  Mr. Rohde performed mechanic duties for Diamond B Services from the time of its incorporation until he was discharged on December 31, 2002.  He earned $3,200 per month for his services, which Diamond B Services paid in bi-monthly payments of $1,600.

[¶ 6]  During 2002, Diamond B Services did not pay Mr. Rohde for several pay periods.  In December 2002, Randy Burry gave Mr. Rohde a check for $2,500 and informed him that Diamond B Services could no longer afford his services.  Mr. Rohde filed a claim with the Department for the remainder of his unpaid wages.  Diamond B Services agreed it owed Mr. Rohde $944.94, but disputed the remainder of his claim and requested a contested case hearing.

[¶ 7]  A hearing officer for the Department's appeals section held a contested case hearing on November 25 and 26, 2003.  Diamond B Services argued that the Department did not have statutory authority to

---

1.  It is unclear from the record what Randy Burry's association with Diamond B Casing was when he contacted Mr. Rohde.  There is, however-

er, no claim that Robert Burry objected to Randy Burry's decision to hire Mr. Rohde.

decide Mr. Rohde's wage claim because it exceeded two months wages and Mr. Rohde was an independent contractor rather than an employee. Finally, Diamond B Services argued that, even if the Department had authority to hear Mr. Rohde's wage claim, Diamond B Services was entitled to deduct certain amounts from his checks for monies he owed to the company. Mr. Rohde argued that he was entitled to be paid his wages and requested that the Department award him interest on the unpaid wages, attorney fees and costs.

[¶ 8] The hearing officer found Mr. Rohde was Diamond B Services' employee and the company owed him $8,700 in wages, but ruled that, under statute, it could award a maximum of two months worth of wages, or in this case $6,400. She also concluded that Diamond B Services' wage offset claims were unfounded. The hearing officer denied Mr. Rohde's request for interest on the unpaid wages, attorney fees and costs on the basis that the Department did not have the authority to make such an award.

[¶ 9] Each party filed a petition for review with the district court. The district court affirmed the hearing officer's decision, but stated that Diamond B Services should have been credited with the $944 payment it made to Mr. Rohde. The district court ruled, however, that even with the credit, Mr. Rohde's claim was valid for more than the $6,400 maximum and the hearing officer's ruling should, therefore, stand. Diamond B Services appealed in Case No. 04–258, and Mr. Rohde appealed in Case No. 04–259. We consolidated the cases for review.

## STANDARD OF REVIEW

■ [¶ 10] As with all decisions from administrative agencies, the Wyoming Administrative Procedures Act governs this Court's review of decisions from the Department. See *DC Production Service v. Department of Employment*, 2002 WY 142, ¶ 6, 54 P.3d 768, 771 (Wyo.2002). Our review of agency decisions is limited to those considerations specified in Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2005) which provides in pertinent part:

(c) To the extent necessary to make a decision and when presented, the review-ing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

. . .

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

. . .

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 11] In *KG Construction, Inc. v. Sherman,* 2005 WY 116, 120 P.3d 145, we reiterated our standard for reviewing an administrative agency's findings of fact:

The substantial evidence test is the appropriate standard of review in appeals from contested case proceedings when factual findings are involved and both parties submit evidence. *Robbins v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2003 WY 29, ¶ 18, 64 P.3d 729, 732 (Wyo.2003). Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. It is more than a scintilla of evidence. Even if the factual findings are found to be supported by substantial evidence, the ultimate agency decision may still be found to be arbitrary or capricious for other reasons. An appellate court does not examine the record only to determine if there is substantial evidence to support the agency's decision, but it also must examine the conflicting evidence to determine if the hearing examiner could have reasonably made its finding and order upon all of the evidence before it. *Newman v. State ex rel. Wyoming Workers' Safety and Com-*

*pensation Div.,* 2002 WY 91, ¶ 24, 49 P.3d 163, 172 (Wyo.2002).

[¶ 12] An administrative agency's conclusions of law are not entitled to the same deference as its factual findings. We review an agency's conclusions of law *de novo,* and "[w]e will affirm an agency's legal conclusion only if it is in accordance with the law." *DC Production Service,* ¶ 7.

## DISCUSSION

### A. Department of Employment's Jurisdiction to Hear Mr. Rohde's Wage Claim

[¶ 13] Diamond B Services insists that the Department did not have subject matter jurisdiction to hear Mr. Rohde's claim for unpaid wages. We will consider this issue first because subject matter jurisdiction is an issue of such magnitude. "The issue of subject matter jurisdiction is so fundamental that it cannot be waived, can be raised on the court's own motion, and can be raised at any time, even on appeal." *Mutual of Omaha Ins. Co. v. Blury–Losolla,* 952 P.2d 1117, 1120 (Wyo.1998). Subject matter jurisdiction refers to "the power to hear and determine cases of the general class to which the proceedings in question belong." *Lacey v. Lacey,* 925 P.2d 237, 238 (Wyo.1996) (quoting *Fuller v. State,* 568 P.2d 900, 903 (Wyo. 1977)). Like a court, an administrative agency is required to have subject matter jurisdiction before it can hear a case. *Bruns v. TW Services, Inc.,* 2001 WY 127, ¶ 16, 36 P.3d 608, 613–14 (Wyo.2001). The determination of whether the agency has subject matter jurisdiction is a question of law to be reviewed *de novo. Director of the Office of State Lands & Investments, Board of Land Commissioners v. Merbanco, Inc.,* 2003 WY 73, ¶ 7, 70 P.3d 241, 246 (Wyo.2003).

[¶ 14] The Department derives its subject matter jurisdiction to hear wage claims from statute. There are two statutes which pertain to the Department's authority to resolve Mr. Rohde's wage claim—Wyo. Stat. Ann. § 27–4–502 and § 27–4–104 (LexisNexis 2005). Section 27–4–502 states:

The department is hereby empowered to take claims for unpaid wages under the provisions of W.S. 27–4–101 and 27–4–104. The department in taking a claim for unpaid wages as provided for in this act is not to exceed the sum of five hundred dollars ($500.00) or two (2) months wages, whichever is the greater, per employee per wage claim.

Section 27–4–104 pertains to wage claims from employees who quit or are discharged from their positions. That provision provides, in pertinent part:

(a) Whenever an employee quits the service or is discharged, the employee shall be paid whatever wages are due him in lawful money of the United States of America, or by check or draft which can be cashed at a bank, within five (5) working days of the date of termination of employment. The employer may offset from any monies due the employee as wages, any sums due the employer from the employee which have been incurred by the employee during his employment. . . .

(b) Whenever an employee who has quit or has been discharged from service has cause to bring suit for wages earned and due, and shall establish in court the amount which is justly due, the court shall allow to the plaintiff interest on the past due wages at the rate of eighteen percent (18%) per annum from the date of discharge or termination, together with a reasonable attorney fee and all costs of suit. . . .

[¶ 15] To resolve this issue, we must interpret the relevant statutory provisions. Our statutory interpretation rules are well-known:

"We first decide whether the statute is clear or ambiguous. This Court makes that determination as a matter of law. A 'statute is unambiguous if its wording is such that reasonable persons are able to agree as to its meaning with consistency and predictability.' A 'statute is ambiguous only if it is found to be vague or uncertain and subject to varying interpretations.' "

*Powder River Coal Co. v. State Bd. of Equalization,* 2002 WY 5, ¶ 6, 38 P.3d 423, 426 (Wyo.2002) (citations omitted). *State ex rel.*

*Dep' t. of Revenue v. Buggy Bath Unlimited, Inc.,* 2001 WY 27, ¶ 16, 18 P.3d 1182, 1187 (Wyo.2001). "If, on the other hand, the Court determines that a statute is ambiguous, it may use extrinsic aids of statutory interpretation to help it determine the legislature's intent." *Shippey v. Rogers (In re Estate of Kirkpatrick),* 2003 WY 125, ¶ 7, 77 P.3d 404, 406 (Wyo.2003).

It is a basic rule of statutory construction that courts may try to determine legislative intent by considering the type of statute being interpreted and what the legislature intended by the language used, viewed in light of the objects and purposes to be accomplished. Furthermore, when we are confronted with two possible but conflicting conclusions, we will choose the one most logically designed to cure the mischief or inequity that the legislature was attempting to accomplish.

*Id.,* quoting *Collicott v. State ex rel. Wyo. Workers' Safety and Comp. Div.,* 2001 WY 35, ¶ 9, 20 P.3d 1077, 1080–81 (Wyo.2001). While considering the statutory language, we give effect to every word, clause and sentence, and construe them in *pari materia. Kunkle v. State ex rel., Wyo. Workers' Safety and Comp. Div.,* 2005 WY 49, ¶ 11, 109 P.3d 887, 889–90 (Wyo.2005); *Pedro/Aspen, Ltd. v. Bd. of County Comm'rs,* 2004 WY 84, ¶ 27, 94 P.3d 412, 420 (Wyo.2004).

[¶ 16] Focusing on the word "take" in § 27–4–502, Diamond B Services insists that the legislature limited the Department's authority by allowing it to hear only wage claims which have a value of $500 or two months wages, whichever is greater. Larger claims, argues Diamond B Services, must be resolved through civil suit, which is allowed by § 27–4–104(b).[2] The Department interpreted its statutory authority differently. It concluded that it can hear wage claims of any amount, but it is limited to awarding two months salary or $500, whichever is greater.

[¶ 17] In accordance with our rules of statutory construction, we look first to the plain language of the statute. In the first sentence of § 27–4–502, the Department is empowered to "**take**" claims for unpaid wages under the provisions of § 27–4–104. Section 27–4–104 allows a separated employee to bring a suit for any wages "earned and due" which are not paid within five days after termination of the employment relationship. The second sentence of § 27–4–502 limits the Department's authority by stating that "[t]he department in **taking** a claim for unpaid wages as provided for in this act is not to exceed the sum of five hundred dollars ($500.00) or two (2) months wages, whichever is the greater, per employee per wage claim." The question then, is whether the legislature intended that the Department entertain only claims involving $500 or two months wages, whichever is greater, or if it simply meant to limit the amount it could award for unpaid wages.

[¶ 18] "Take" is defined by Black's Law Dictionary 1492 (8th ed. (1999)) as "to obtain possession or control." To the extent the statute in one part seems to give the Department jurisdiction over all unpaid wage claims and then, in another part, states that in "taking" the claim it is limited to a certain monetary amount, we conclude that it is ambiguous. We must, therefore, turn to our typical statutory interpretation tools to determine whether the Department has jurisdiction over claims which exceed two months salary.

[¶ 19] Section 27–4–104 is an old statute, having first been adopted in 1919, when courts almost exclusively exercised judicial powers. See A. Aman & W. Mayton, *Administrative Law,* Introduction, 1–8, 118–20 (2000) (generally discussing the history of administrative law and the growth of administrative agency adjudicatory powers). Over time, the Wyoming Legislature empowered some administrative agencies with the authority to make adjudicatory decisions in contested case hearings. See e.g., Wyoming Administrative Procedures Act, Wyo. Stat. Ann. § 16–3–101, *et seq.* (LexisNexis 2003). Following this trend, in 1971 the legislature enacted § 27–4–502, thereby providing em-

---

**2.** Section 27–4–503, which was repealed in 2001, also provided: "Any proceedings by one (1) or more employees to assert claims arising pursuant to the terms of this act [§§ 27–4–501 through 27–5–508], may be brought in any court of competent jurisdiction."

ployees with an administrative procedure to recover unpaid wages.[3]

[¶ 20] When considered *in pari materia*, the wage collection statutes emphasize the importance of an employee's right to the prompt payment of wages. *Jensen v. Fremont Motors Cody, Inc.*, 2002 WY 173, ¶ 21, 58 P.3d 322, 328 (Wyo.2002). The statutes provide several tools to aid the employee in recovering wages rightfully due to him, including the expedited contested case process before the Department and authorizing the county attorney to assist the employee in collecting wages which the Department has declared must be paid. Sections 27–7–504 through 506.

[¶ 21] The legislature is, however, also cognizant of the fact that contested case proceedings are different than court proceedings. See e.g., Wyoming Administrative Procedures Act, § 16–3–101, *et seq.* In general, contested case proceedings have more lenient rules of evidence and procedures than formal court proceedings. Wyo. Stat. Ann. §§ 16–3–107 through 109 (LexisNexis 2005). See also, *Lunde v. State ex rel., Wyo. Workers' Comp. Div.*, 6 P.3d 1256, 1260 (Wyo.2000). Thus, it is not surprising that the legislature recognized the limitation of administrative processes by placing a limit on the amount the Department could award to an employee after a contested case proceeding.

[¶ 22] Many of these same principles were evaluated in *Hurst v. Davis*, 386 P.2d 943 (Wyo.1963). In that case, the landlord sought to eject a tenant from his property and collect $600 in unpaid rents. *Id.* at 943–45. At that time, exclusive jurisdiction for forcible entry and detainer suits lay in the justice of the peace courts. *Id.* The justice of the peace court's monetary jurisdiction was, however, limited to $200. *Id.* at 950. We recognized that the legislature's principal objective in enacting the forcible entry and detainer statutes was to give landlords a summary remedy against tenants who hold over after their tenancy has expired. *Id.* at 949. The legislature did not intend to deny a landlord, who was owed more than $200 in rent, the opportunity to use the abridged procedure provided in the forcible entry and detainer statute. *Id.*

[¶ 23] We recognized, however, that the legislature had placed a monetary limit on the justice of the peace court's jurisdiction. In resolving this "conundrum," we stated that, although a judgment by the justice of the peace court for an amount of rent due in excess of its monetary jurisdiction would be erroneous, "a mere *finding* of the amount of rent due, even though that amount be in excess of the jurisdictional limitation" would be lawful. *Id.* at 950. Thus, the justice of the peace court could order that the tenant vacate the property, find the amount of rent due, and award the landlord a judgment for unpaid rent up to the amount of its statutory jurisdiction. *Id.* This rationale was confirmed more recently in *Jessen v. Burry*, 13 P.3d 1118, 1121 (Wyo.2000).

[¶ 24] Considering this precedent, together with the purposes of the wage collection statutes, we conclude that the Department's interpretation of its statutory authority is correct. The Department may hear wage claims of any amount, but it is limited to awarding two months salary or $500, whichever is greater.

[¶ 25] In making this ruling, we do not want to give the impression that we are weakening the "amount in controversy" requirement for subject matter jurisdiction. When a statute clearly states an amount in controversy requirement, it must be enforced. In *Mutual of Omaha*, 952 P.2d at 1120, we discussed the amount in controversy limitations upon the county court's (now known as the circuit court) jurisdiction.

When the question of subject matter jurisdiction revolves around the amount claimed, this court has established the following determinative rules: (1) the sum claimed, rather than the amount eventually recovered, controls unless the amount claimed was not done in good faith; (2) to

---

**3.** When the legislature passed the first version of § 27–4–502 in 1971, it placed the Labor Commissioner in the position of deciding unpaid wage claims. 1971 Wyo. Sess. Laws 198. In 2001, the legislature amended the statute and directed the Department of Employment to hear wage claims. 2001 Wyo. Sess. Laws 497.

find a lack of good faith, it must appear to a legal certainty that the claim is really for less than $ 7,000.00; (3) the amount is determined as of the time the action is commenced; and (4) a plaintiff cannot control jurisdiction between the county and district court by setting forth an improper amount in the prayer for relief.

*Id.* (citation omitted). Thus, if we were to interpret § 27–4–502 as stating an "amount in controversy" jurisdictional requirement, we would have to agree with Diamond B Services' argument that the Department did not have jurisdiction to hear Mr. Rohde's wage claim because it exceeded the statutory limit. Our ruling here, however, is that § 27–4–502 does not limit the claims the Department can hear, it simply limits the amount it can award for each unpaid wage claim. The Department correctly ruled that it had the authority to consider and decide Mr. Rohde's wage claim, but that it was limited to awarding a maximum of two months worth of wages.

### B. Employee v. Independent Contractor

[¶ 26] Diamond B Services insists that Mr. Rohde was not entitled to pursue his claim for unpaid wages through the Department because he was an independent contractor rather than an employee. Diamond B Services argues, therefore, that the hearing officer's finding that Mr. Rohde was a salaried employee was not supported by substantial evidence.

[¶ 27] For purposes of wage claims, "employee" is defined as "any person who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." Wyo. Stat. Ann. 27–4–501(a)(ii) (LexisNexis 2003). An independent contractor "is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer except as to the result of the work." *Com-*

bined Insurance Company of America v. Sinclair, 584 P.2d 1034, 1043 (Wyo.1978) quoting *Lichty v. Model Homes,* 66 Wyo. 347, 211 P.2d 958, 967 (Wyo.1949). Our case law provides significant guidance in differentiating between employees and independent contractors.[4]

[¶ 28] The overriding consideration in distinguishing between master-servant relationships and employer-independent contractor relationships is the employer's right to control the means and manner of the work. See e.g., *Stratman v. Admiral Beverage Corp.* 760 P.2d 974, 980 (Wyo.1988); *Cline v. State, Dep't. of Family Services,* 927 P.2d 261, 263 (Wyo.1996); *Noonan v. Texaco, Inc.,* 713 P.2d 160, 164 (Wyo.1986).

> Such a right to control is a prerequisite of the master-servant relationship. Conversely, the absence of such a right of control is a prerequisite of an independent contractor relationship. Master-servant and independent contractor are thus opposite sides of the same coin; one cannot be both at the same time with respect to the same activity; the one necessarily negatives the other, each depending on opposite answers to the same right of control inquiry.

*Coates v. Anderson,* 2004 WY 11, ¶ 7, 84 P.3d 953, 957 (Wyo.2004). When a worker is an independent contractor, the employer is typically interested only in the results of the work and does not direct the details of the how the work is performed. *Noonan,* 713 P.2d at 166; *Natural Gas Processing Co. v. Hull,* 886 P.2d 1181, 1186 (Wyo.1994).

[¶ 29] When an express contract exists between the parties, it is important evidence in defining the relationship, although it is not conclusive of the issue. *Coates,* ¶ 14; *Noonan,* 713 P.2d at 164. Other factors which are important to the determination include: the method of payment, the right to terminate the relationship without incurring liability, the furnishing of tools

---

4. The hearing officer relied on the factors outlined in Internal Revenue Service Ruling 87–41, 1987–1 to determine whether Mr. Rohde was an employee or an independent contractor. The Revenue Ruling essentially encompasses the same principles as Wyoming common law. Be-

cause § 27–4–501(a)(ii) directs us to use the common law definition of "employee," we choose to rely on a synthesis of Wyoming case law rather than the Revenue Ruling to distinguish between employees and independent contractors.

and equipment, the scope of the work, and the control of the premises where the work is to be done. *Stratman,* 760 P.2d at 980; *Combined Insurance* 584 P.2d at 1043. Another factor to be considered is whether the worker devotes all of his efforts to the position or if he also performs work for others. *Id.*

[¶ 30] With regard to the "method of payment" criterion, an independent contractor usually determines the price of his services and bills for his services on a regular basis. *Noonan,* 713 P.2d at 166, citing *Simpson,* 770 F.2d at 501; *Combined Insurance,* 584 P.2d at 1043. On the other hand, when the employer determines the worker's rate of pay and takes deductions out of his paychecks for federal income taxes, Social Security, and Medicare then a master-servant relationship is indicated. *Id.* We have said that payment of workers' compensation and unemployment insurance premiums by an employer suggests that the worker is an employee rather than an independent contractor. See *In re: Claims of Naylor,* 723 P.2d 1237, 1240–41 (Wyo.1986); *In re Reed,* 444 P.2d 329, 330 (Wyo.1968). Similarly, when a worker is eligible to participate in benefit programs such as retirement or insurance plans, as a result of his association with the employer, it suggests a master-servant relationship exists. *Combined Insurance,* 584 P.2d at 1043.

[¶ 31] Applying these factors to the case at bar, we note first that there was no written contract between Diamond B Services and Mr. Rohde. Instead, when Diamond B Services was incorporated in June 2000, the parties entered into a verbal agreement in which Mr. Rohde worked as a mechanic on Diamond B Services' trucks. Some of the trucks were actually owned by Diamond B Services and others were leased by the company, but Mr. Rohde apparently worked on all of the trucks regardless of their ownership status. Diamond B Services paid Mr. Rohde $3,200 per month, in bi-monthly payments of $1,600, and Randy Burry testified that Mr. Rohde was a "salaried employee." There is no evidence that Mr. Rohde submit-

ted any bills to Diamond B Services for his work or that he had control over the price of his services. Randy Burry stated that Mr. Rohde was expected to work all of the hours necessary to complete Diamond B Services' work and was not paid any overtime. Diamond B Services withheld deductions from Mr. Rohde's paychecks for federal income taxes, Social Security, and Medicare.[5] Mr. Rohde apparently participated in Diamond B Services' health insurance program and the company paid unemployment insurance premiums on him.

[¶ 32] Diamond B Services did not set a work schedule for Mr. Rohde, but he generally worked from 7:00 a.m. to 6:00 p.m. on weekdays and half days on Saturday. Although Randy Burry testified that Mr. Rohde could "come and go" as he wanted, Diamond B Services kept track of Mr. Rohde's absences from work and expected him to get all of its work done. Mr. Rohde performed his mechanic services at one of three locations—a truck stop in Pine Bluffs, the Burrys' rented office/shop location in Pine Bluffs, or on the Burrys' "ranch" in Nebraska. Mr. Rohde and Randy Burry both testified that, in the interests of convenience, Mr. Rohde generally performed his mechanic work at the location where the truck was parked. Mr. Rohde's personal pickup was set up with equipment and tools to allow him to repair the trucks at the different locations. Although the record is unclear as to who owned or possessed the truck stop, the Pine Bluffs office/shop facility and the Nebraska ranch were specifically under Diamond B Services' control. Furthermore, it is abundantly clear that Mr. Rohde did not have control or possession of any of the three locations where he routinely performed his mechanical work.

[¶ 33] The tools Mr. Rohde used while working for Diamond B Services were a combination of Mr. Rohde's private supply, Diamond B Services' tools, and Diamond B Casing's tools. Diamond B Services provided specialized equipment for him to perform his work, including a hoist, a welder, and a generator. The welder and generator were placed in the back of Mr. Rohde's personal

---

**5.** Diamond B Services did not withhold any deductions from the last payment it made to Mr.

Rohde of $2,500 in December 2002, and did not include that amount on his 2002 W–2.

pickup so that he could go to the trucks to repair them.. Diamond B Services also furnished a card for Mr. Rohde to use for fuel purchases and allowed him to purchase automotive parts to use in the repairs on its accounts with various automotive parts dealers.

[¶ 34] Randy Burry stated that Mr. Rohde worked on "whatever he wanted" and indicated several times that Mr. Rohde was performing mechanic work for other customers including Diamond B Casing (of which Mr. Rohde was a part owner) and D & B Trucking. Even though the trucks belonged to Diamond B Casing and D & B Trucking, they were leased to Diamond B Services. Although Randy Burry complained that Mr. Rohde did not fill out the paperwork correctly regarding these leased trucks, Mr. Rohde's mechanic work was performed at the request of, and for the benefit of, Diamond B Services. There is no evidence which suggests that Mr. Rohde was compensated by anyone other than Diamond B Services for his work.

[¶ 35] Mr. Rohde testified that he typically visited with Randy Burry each evening to determine which trucks he would work on the next day. Randy Burry would meet with the truck drivers about the trucks and then either direct Mr. Rohde to perform the necessary repairs or maintenance or ask him to talk to the drivers to determine what work needed to be done. In addition, Diamond B Services obviously had the right to terminate Mr. Rohde's employment as it, in fact, exercised that right in December of 2002.

[¶ 36] Although there were a few factors which support a finding that Mr. Rohde was an independent contractor, such as his use of his personal pickup and some of his own tools in the course of his employment, there was, obviously, a wealth of evidence to support the hearing officer's finding that Diamond B Services controlled Mr. Rohde's work. Randy Burry told Mr. Rohde which trucks to work on and Diamond B Services controlled, for the most part, the locations where he performed that work. Diamond B Services treated Mr. Rohde as an employee. The company set his rate of pay, took the typical employee deductions out of his check, al-

lowed him to participate in its employee benefits programs, and, ultimately, exercised its right to terminate the employment relationship. The Department's determination that Mr. Rohde was an employee of Diamond B Services and was not an independent contractor was definitely supported by substantial evidence.

### C. Time Off Work

[¶ 37] Diamond B Services claims that the hearing examiner erred when she ruled that it was not entitled to deduct $2,773.16 from Mr. Rohde's pay to account for 26 days he was absent from work. The 26 days included vacation days, sick days, Sundays and legal holidays. Diamond B Services claims that Mr. Rohde was not entitled to be paid for any time he was absent from work and it could reduce his pay if he took any time off work. By requiring it to pay Mr. Rohde for days he was absent from work, Diamond B Services argues that the Department improperly imposed upon it a contractual responsibility to provide "paid vacation" to Mr. Rohde when the parties had no such agreement.

[¶ 38] The hearing officer relied on Wyo. Stat. Ann. § 27-4-507(b) (LexisNexis 2003) in ruling that Diamond B Services was not entitled to refuse to pay Mr. Rohde for the days he missed work. That statute states:

> (b) It shall be unlawful for any employer to pay to any employee a lower wage, salary, or compensation than that provided for or agreed upon by (1) a collective bargaining agreement; (2) a contract between the employer and employee. In no event shall a collective bargaining agreement or a contract provide for compensation lower than any applicable existing statute of this state.

*Id.*

[¶ 39] The hearing officer found that the parties did not have an express agreement with regard to vacation time, and the record bears that out. Mr. Rohde's pay stubs consistently showed "0" on the vacation hours line, and neither party testified that Mr. Rohde was entitled to a certain amount of vacation per year. Although not stated in so

many words, the hearing officer essentially found that the parties' course of conduct indicated that Mr. Rohde was allowed to take days off work without having his pay reduced. See e.g., *WERCS v. Capshaw*, 2004 WY 86, ¶ 20, 94 P.3d 421, 426 (Wyo.2004) (discussing how the parties' course of conduct may define an employment relationship).

[¶ 40] Mr. Rohde testified that Randy Burry was aware when he was going to be absent from work. During February 2002, Mr. Rohde missed a few days of work to attend a car race in California. That trip had been arranged by his girlfriend as a surprise for him and she had contacted Randy Burry and received authorization for Mr. Rohde to be absent from work. He received full pay in the paycheck which covered the days he was absent in February 2002.

[¶ 41] Mr. Rohde's other absences included short vacations around and including the Independence Day and Thanksgiving holidays. Mr. Rohde had, apparently, been taking those vacations for years to attend family functions, and Randy Burry was aware that Mr. Rohde would be gone on those days in 2002. There is no indication that his pay had been reduced in previous years for taking those vacation days and, in fact, the paycheck which covered the Independence Day holiday in 2002 did not include a deduction for the days he was absent from work. Mr. Rohde was also absent from work in December for the Christmas holiday, and he testified that Randy Burry was aware that he would be gone during that time.

[¶ 42] Substantial evidence exists in the record to support the hearing officer's determination that the parties' course of conduct evinced an agreement that Mr. Rohde was to have time off from work without having his pay reduced.

### D. Wage Offsets

[¶ 43] At the contested case hearing, Diamond B Services claimed that Mr. Rohde

owed it money for various reasons and it was, therefore, entitled to deduct those amounts from his paychecks under the Department's wage offset rules. In particular, Diamond B Services argued that it was entitled to deduct money from Mr. Rohde's paychecks as reimbursement for: 1) unauthorized fuel purchases for his personal pickup ($1,420.90); 2) Diamond B Services purchase of license plates for Mr. Rohde's personal pickup ($72.33); 3) auto parts purchased by Mr. Rohde on Diamond B Services accounts and installed on his personal pickup or the vehicles of his family and friends ($577.91); 4) the payoff of Mr. Rohde's truck loan ($3,330.07); and 5) loss of a tool box ($313.30).[6] The hearing officer ruled that, under the Department's wage offset rules, Diamond B Services was not entitled to any of these wage offsets. Diamond B Services argues that the Department misapplied the wage offset rules when it refused to allow the offsets it claimed.

[¶ 44] Under Wyo. Stat. Ann. § 27–4–104(a) "the employer may offset from any monies due the employee as wages, any sums due the employer from the employee which have been incurred by the employee during his employment." The Department adopted Chapter I, Section 6 of the Department of Employment Labor Standards Rules to provide rules and procedures for wages offsets. The wage offset rules state in pertinent part:

(b) Offsets.

The following sums shall constitute proper offsets from wages due an employee.

\* \* \*

(v) Any sums deducted from wages as payment for any purchase of goods or services by the employee from the employer, provided:

(A) That the goods or services sold by the employer are sold in the ordinary course of his or her business.

---

**6.** At the contested case hearing, Diamond B Services argued that it was entitled to additional wage offsets including: cellular telephone charges; the costs of repairing a truck on which Mr. Rohde allegedly negligently performed mechanic work; a used dining set which the Burrys

provided to Mr. Rohde for his Pine Bluffs residence; and a hitch and exhaust system installed on Mr. Rohde's personal vehicle. Diamond B Services does not, however, continue to assert these claims on appeal.

(B) That the employee has actual or constructive possession of the goods or services purchased; and

(C) That the employee's purchase is evidenced by the employee's written acknowledgement.

(vi) Any sums deducted from wages for damages suffered by the employer due to the employee's negligence, provided:

(A) That the employee's negligence is determined by a judicial proceeding;

(B) That the amount of the damage suffered by the employer is determined by a judicial proceeding;

(C) That the negligence and damages arise in the course of the employment; and

(D) That the employer has not received payments, compensation, or any form of restitution from any insurer, assurer, surety or guaranty to cover any of the damages. Where the employer has received payments, compensation, or any form of restitution from any insurer, assurer, surety or guaranty to cover any of the damages caused by the employee's negligence, the sum of the offset shall not exceed the amount of any applicable deductible or two hundred fifty dollars ($250.00) whichever is less.

\* \* \*

(viii) Any sums deducted from wages as repayment to the employer by the employee of any cash advances, loans or payments of expenses for optional benefits such as tuition assistance, relocation and training, made to the employee by such tuition assistance, relocation and training, made to the employee by such employer, provided:

(A) That the cash advance, loan or payment of expenses to the employee occurred while said employee was in the employ of such employer; and

(B) That the employee's receipt of such cash advance, loan or payment of expenses is evidenced by the employee's written acknowledgement.

\* \* \*

(x) Any sums deducted as wages as payment for any purchase of tools, equipment, uniforms, or other items required for the employment of the employee, provided:

(A) That the employee had actual or constructive possession of the items; and

(B) That the employee's purchase and receipt of the item is evidence by written acknowledgement.

(xi) Any sums deducted from wages as payment for tools, equipment, uniforms, or other items assigned to the employee by the employer, provided:

(A) That such item was assigned to the employee to be used within the scope of the employee's employment;

(B) That the employee gave written acknowledgement of the receipt of such items; and

(C) That such items have not been returned to the employer upon termination.

Department of Employment Labor Standards Rules, Chap. I, § 6.

### 1. Fuel Purchases

██ [¶ 45]   When he started working for Diamond B Services, the company issued Mr. Rohde a "Comdata" fuel card.  Randy Burry testified that Mr. Rohde was only allowed to use the card to purchase diesel fuel for the large trucks used in their business.   He claimed that Mr. Rohde was not authorized to purchase gasoline on the card.  Mr. Rohde did, in fact, purchase gasoline for his personal pickup, which he used in the course of his employment.   Mrs. Burry, who worked as the bookkeeper for the company, received a faxed report from Comdata each day which showed the transactions on the various fuel cards used by Diamond B Services.  The fuel report apparently showed which card was used and the amount and cost of the fuel purchased.  Mr. Rohde testified that, when he received his card, he asked Mrs. Burry whether he should turn in any of his receipts and she said, "no" because she received the daily Comdata reports.   Nevertheless, he saved the receipts and presented them to Diamond B Services after he was discharged.

[¶ 46]   Diamond B Services contends that the hearing officer erred by refusing to allow it to deduct the value of the fuel he used in

his personal pickup from Mr. Rohde's pay. Diamond B Services argued that it was entitled to offset the values of the fuel purchases from his wages because they were either "cash advances" under Section 6(b)(viii) or "other items required for the employment of the employee" under Section 6(b)(x).

[¶ 47] Section 6(b)(viii) allows an employer to deduct the value of "cash advances" made to the employee during his employment. "Cash" is defined as "money or its equivalent." Black's Law Dictionary 229 (8th ed.1999). An "advance" is "the furnishing of money or goods before any consideration is received in return." *Id.* at 57. Fuel obviously does not qualify as "cash" as it is not money or its equivalent. Furthermore, the definition of "advance" indicates that the party doing the advancing (i.e. the employer) has prior knowledge of the transaction. Diamond B Services maintained that it did not have knowledge of or authorize the fuel purchases; consequently, they could not be "advances."

[¶ 48] Neither do the fuel purchases qualify under Section 6(b)(x) "as payment for any purchase of tools, equipment, uniforms, or other items required for the employment of the employee." Diamond B Services maintained that Mr. Rohde was supposed to use a company vehicle rather than his personal vehicle in the course of his employment. Under Diamond B Services' theory that the fuel purchases were not authorized, the fuel expenses do not qualify as "other items required for the employment" under subsection (x). The fuel could not have been purchased on the basis that it was "required for the employment" if the employer insisted it did not authorize the purchase.

### 2. Truck Loan Payoff

[¶ 49] Diamond B Services argues that it was entitled to deduct the amount it paid to satisfy Mr. Rohde's truck loan from the wages due to him. Mr. Rohde went to work for Diamond B Casing in 1998. He testified that Randy Burry had contacted him when he was living in Grand Island, Nebraska and asked him to move to Pine Bluffs to work for Diamond B Casing. In order to entice Mr. Rohde to accept the job

offer, Randy Burry agreed to pay off his pickup loan and to purchase a car from Mr. Rohde. On October 27, 1998, Mrs. Burry wrote a $3,330.07 check to Mr. Rohde's lender on a "Diamond B" account. Mr. Rohde did not repay "Diamond B Casing," "Diamond B Services," "Diamond B," or the Burrys for the loan payment.

[¶ 50] The hearing officer ruled that Diamond B Services was not entitled to deduct the amount "Diamond B" paid to satisfy Mr. Rohde's pickup loan from Mr. Rohde's wages. The Department rules allow an employer to deduct cash advances or payments of expenses made by the employer to, or on behalf of, the employee. However, in order to be entitled to this deduction, an employer must show that the cash advance or payment was made while the employee was employed by the employer and the employee must give his written authorization to the employer. Section 6(b)(viii). In this case, the truck loan payment was made by "Diamond B" in 1998, when Mr. Rohde was working for Diamond B Casing. Randy Burry claims that "Diamond B" was a predecessor of Diamond B Services and, therefore, it should be counted as a payment while Mr. Rohde was working for Diamond B Services. The record does not bear out Diamond B Services' claim. Clearly, Mr. Rohde was working for Diamond B Casing (which was Robert Burry's company), rather than Diamond B Services when the pickup loan was satisfied. In addition, there was no written agreement indicating that Mr. Rohde would pay back the money for the loan payment or any other type of receipt signed by the employee acknowledging receipt of the loan payment.

### 3. License Plates and Auto Parts

[¶ 51] Diamond B Services claimed that it was entitled to offset Mr. Rohde's wages with the amount it paid for the license plates for his personal pickup and for automobile parts he charged on the company's account and used to repair his personal vehicle and the vehicles of his friends and family. It maintains that these payments amounted to cash advances under Section 6(b)(viii).

[¶ 52] Mr. Rohde's license plates were due for renewal at the end of December 2002. Since Diamond B Services had not paid him in quite some time, Mr. Rohde borrowed money from his father to pay for his license plates. When he told Randy Burry that he was going to go into Cheyenne to purchase his license plates, Randy Burry told him that Mrs. Burry was going to Cheyenne anyway and she would get the license plates for Mr. Rohde's truck. Mr. Rohde offered to pay for the license plates with the money he had borrowed from his father, but the Burrys declined his offer.

[¶ 53] In addition, Mr. Rohde routinely charged parts for his work on accounts Diamond B Services carried with various auto parts dealers. He also occasionally charged parts which he used to repair his personal vehicle or the vehicles of his family and friends. Mr. Rohde testified that he had permission to charge the parts, and, when he offered to reimburse the company for those costs, he was refused.

[¶ 54] The hearing officer determined that Diamond B Services was not entitled to an offset for the amount it paid for Mr. Rohde's license plates and the auto parts because they were not "cash advances." Diamond B Services did not give "cash" to Mr. Rohde when it supplied him with license plates and automobile parts. Furthermore, there was substantial evidence that Diamond B Services did not expect to be reimbursed for the cost of the license plates or the automobile parts; consequently, those payments obviously were not "advances."

#### 4. Stolen Toolbox

[¶ 55] Diamond B Services claimed that it was entitled to deduct from Mr. Rohde's wages the value of a toolbox which was stolen from Mr. Rohde's pickup. It claims that, under § 6(b)(xi) of the offset rules, the tool box was assigned to Mr. Rohde and was not returned to Diamond B Services at the end of his employment. Mr. Rohde acknowledged that, during his employment, he had a tool box which contained Diamond B Services tools, and that it had been stolen from the back of his pickup. He claimed that he reported the theft to his personal insurer,

but, when he asked Randy Burry for a list of the tools for the insurer, Randy Burry told him "not to worry about it."

[¶ 56] The hearing officer denied the offset because there was no written acknowledgement of his receipt of the tools. Included in the record is an example of Diamond B Services toolbox checklist with a place for the employee to sign, acknowledging receipt of the tools. There is, however, no such form signed by Mr. Rohde. Consequently, there was no written authorization from Mr. Rohde which would have allowed Diamond B Services to deduct the value of the tool box from his wages pursuant to § 6(b)(xi) of the Department's rules.

[¶ 57] The hearing officer's conclusions that Diamond B Services was not entitled to any offsets against Mr. Rohde's wages were supported by substantial evidence.

#### 5. Validity of Wage Offset Rules Requiring Employee's Written Authorization

[¶ 58] Diamond B Services argues that, in adopting the wage offset rules which require an employee's written acknowledgement before certain sums may be deducted from his wages, the Department exceeded its statutory authority. Section 27–2–104(a) outlines the Department's authority and states in pertinent part:

> (a) The department of employment shall:

> (i) Enforce all laws enacted by the legislature of Wyoming, relating to labor, wages, hours of labor, and to the health, welfare, life and limb of the workers of this state;

> * * *

> (v) [P]romulgate reasonable rules.

[¶ 59] The substantive law which authorized wage offsets is included in § 27–4–104(a). The relevant language states: "The employer may offset from any monies due the employee as wages, any sums due the employer from the employee which have been incurred by the employee during his employment."

[¶ 60] Diamond B Services claims that § 27–4–104(a) allows the employer to deduct **any** sums it believes are due it from the employee and, by requiring written authorization from the employee before an employer may deduct amounts from his wages, the Department's rule exceeds its statutory authority.

> "An administrative agency is limited in authority to powers legislatively delegated. 'Administrative agencies are creatures of statute and their power is dependent upon statutes, so that they must find within the statute warrant for the exercise of any authority which they claim.' "

*Amoco Production Co. v. State Bd. of Equalization,* 12 P.3d 668, 673 (Wyo.2000) (citations omitted). "An agency is wholly without power to modify, dilute or change in any way the statutory provisions from which it derives its authority." *Platte Development Co. v. State, Environmental Quality Council,* 966 P.2d 972, 975 (Wyo. 1998). Thus, administrative agencies are bound to comply with their enabling statutes. *Sears v. Romer,* 928 P.2d 745, 751 (Colo.App.1996). An administrative rule or regulation which is not expressly or impliedly authorized by statute is without force or effect if it adds to, changes, modifies, or conflicts with an existing statute. *Id.* Conversely, a rule or regulation which is expressly or impliedly authorized by the enabling statute will be given force and effect. *Id. Public Service Comm'n v. Formal Complaint of WWZ Co.,* 641 P.2d 183, 186 (Wyo.1982) (An agency's "implied powers are only those derived by necessary implication from express statutory authority granted to the agency."); *Painter v. Abels,* 998 P.2d 931, 938 (Wyo.2000) ("Administrative rules and regulations have the force and effect of law.").

*Billings v. Wyo. Bd. of Outfitters and Guides,* 2001 WY 81, ¶ 24, 30 P.3d 557, 568–69 (Wyo.2001).

[¶ 61] The obvious purpose of the offset rules is to define, under what circumstances, monies are due to the employer from the employee pursuant to § 27–4–104(a). Clearly defining the respective responsibilities of the parties to the employment relationship serves the legislative purposes of the wage collection statutes. See *Jensen,* ¶ 21.

[¶ 62] Under § 27–4–507(b) and § 27–4–104(b), an employer must fully and promptly pay an employee's wages as provided by the parties' employment agreement, and payment of any lower amount is unlawful. The only deductions which an employer may make from an employee's wages are those which are actually due to the employer. Requiring written authorization from the employee ensures there is a mutual understanding between the employee and employer about the deduction. This requirement, obviously, helps prevent misunderstandings between employers and employees and helps avoid situations, such as the one in this case, where the employer claims an amount is due and the employee argues otherwise. We conclude, therefore, that the wage offset rules requiring written authorization are reasonable and promulgation of the rules did not exceed the Department's statutory authority.

### E. Attorney Fees

[¶ 63] In his cross appeal, Mr. Rohde claims that the hearing officer erred by concluding that the Department did not have authority under § 27–4–104(b) to award him interest, attorney fees, and costs. That statute states, in pertinent part:

> (b) Whenever an employee who has quit or has been discharged from service has cause to bring suit for wages earned and due, and shall establish in court the amount which is justly due, the court shall allow the plaintiff interest on the past due wages at the rate of eighteen percent (18%) per annum from the date of discharge or termination, together with a reasonable attorney fee and all costs of suit.

[¶ 64] Diamond B Services argued, and the hearing officer concluded, that, under § 27–4–104(b), only a court could award interest, attorney fees and costs. As we stated earlier in this opinion, we are charged with the duty to construe all statutes pertaining to the collection of unpaid wages *in pari materia.* Thus, § 27–4–104(b) must be construed together with the statutes which delegated

the power to collect unpaid wages to the Department— § 27–4–501 *et seq.* As we stated earlier, § 27–4–104 was adopted in 1919, when courts rather than administrative agencies typically resolved matters like wage claims. In 1967, the legislature amended § 27–4–104 and added subsection (b) which allowed for the award of interest, attorney fees and costs. Section 27–4–502, which was adopted in 1971, empowers the department to "take claims for unpaid wages under the provisions of W.S. 27–4–101 and 27–4–104." Section 27–4–502 evinces a legislative intent to allow the Department to take the place of the court in determining wage claims. The attorney fees provision predates the administrative procedure. Since the legislature specifically directed the Department to take claims under § 27–4–104 and did not limit its authority to subsection (a), we conclude that the department is authorized to make awards under subsection (b), as well. Consequently, the Department erred when it ruled that it did not have the authority to award interest, attorney fees and costs under § 27–4–104(b).

[¶ 65] We, therefore, affirm the Department's decision awarding Mr. Rohde his unpaid wages and reverse its determination that it did not have the authority to award interest, attorney fees and costs. We remand this matter to the district court who will then remand it to the Department for a determination on those matters.